Peter M. Kellett (admitted *pro hac vice*)
*pkellett@dykema.com*
**DYKEMA GOSSETT**
400 Renaissance Center, Suite 2300
Detroit, MI  48243
Telephone:  (313) 568-6800
Facsimile:  (313) 568-6658

Paul L. Nystrom (admitted *pro hac vice*)
*pnystrom@dykema.com*
**DYKEMA GOSSETT**
39577 Woodward Ave., Suite 300
Bloomfield Hills, MI  48304
Telephone:  (248) 203-0700
Facsimile:  (248) 203-0673

John M. Thomas (SBN 266842)
*jthomas@dykema.com*
**DYKEMA GOSSETT**
2723 South State Street, Suite 400
Ann Arbor, MI 48104
Telephone:  (734) 214-7613
Facsimile:  (734) 214-7696

J. Kevin Snyder (SBN 107509)
*ksnyder@dykema.com*
Dawn N. Williams (SBN 267925)
*dwilliams@dykema.com*
**DYKEMA GOSSETT**
333 S. Grand Ave., Suite 2100
Los Angeles, CA  90071
Telephone:  (213) 457-1800
Facsimile:  (213) 457-1805

Attorneys for Defendants HARLEY-DAVIDSON MOTOR COMPANY GROUP, LLC, HARLEY-DAVIDSON, INC., and HARLEY-DAVIDSON MOTOR COMPANY, INC.

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILLIP JOHNSON, JIMMY ALDRIDGE, RANDY VANDERMOLEN, and MATTHEW WEYUKER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>HARLEY-DAVIDSON MOTOR COMPANY GROUP, LLC; HARLEY-DAVIDSON, INC., WHICH WILL DO BUSINESS IN CALIFORNIA AS: (WISCONSIN) HARLEY-DAVIDSON, INC., HARLEY-DAVIDSON MOTOR COMPANY, INC., and DOES 1-50,<br><br>Defendants. | Case No. 2:10-CV-02443-JAM-EFB<br><br>Honorable John A. Mendez<br><br>**DEFENDANTS HARLEY-DAVIDSON MOTOR COMPANY GROUP, LLC, HARLEY-DAVIDSON, INC. AND HARLEY-DAVIDSON MOTOR COMPANY, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE EXPERT DECLARATION AND TESTIMONY OF RUSSELL DARNELL**<br><br>[Filed Concurrently With<br><br>(1) Notice of Motion and Motion to Exclude Expert Declaration and Testimony of Russell Darnell;<br><br>(2) [Proposed] Order]<br><br>Date:   5/2/2012<br>Time:  9:30 a.m.<br>Ctrm:  6<br><br>Complaint Filed:     September 10, 2010<br>Trial Date:              None |

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

RELEVANT FACTUAL BACKGROUND.......................................................................... 2

LEGAL ARGUMENT.......................................................................................................... 3

I.      APPLICABLE LEGAL STANDARD. ...................................................................... 3

II.     DARNELL IS NOT QUALIFIED TO GIVE THE OPINIONS HE RENDERS IN
        THIS CASE. ............................................................................................................... 5

III.    DARNELL'S OPINIONS ARE NOT RELIABLE AND ARE BASED ON PURE
        SPECULATION. ........................................................................................................ 6

        A.      Darnell's Excessive Heat Opinions ............................................................... 7

        B.      Darnell's Opinion That A Liquid Cooled Design Or Retrofit Is Needed To
                Address Engine Heat ................................................................................... 15

        C.      Darnell's Opinions Regarding EITMS. ....................................................... 16

        D.      Darnell's Opinion That Excessive Heat Causes Premature Wear And Tear
                Of Mechanical Systems. ............................................................................. 18

        E.      Darnell Lacks Any Basis To Compare The Class Motorcycles To Other
                Manufacturers' Motorcycles........................................................................ 20

IV.     DARNELL DID NOT RELIABLY APPLY HIS OPINIONS TO THE FACTS
        OF THIS CASE OR ACCOUNT FOR ALTERNATIVE EXPLANATIONS FOR
        THE HEAT. .............................................................................................................. 21

        A.      Darnell Cannot Apply His Excessive Heat/Design Defect Opinion To
                Over 100 Model Motorcycles. ..................................................................... 21

        B.      Darnell Did Not Account For Other Factors That Could Affect Heat. ....... 22

CONCLUSION....................................................................................................................23

1

2

<u>**TABLE OF AUTHORITIES**</u>

3

**Page(s)**

4

CASES

5

*Am. Honda Motor Co. v. Allen,*
 600 F.3d 813 (7th Cir. 2010) .............................................................2, 5

6

7

*Avila v. Willits Env't Remediation Trust,*
 No. C99-3941, 2008 WL 360858 (N.D. Cal. Feb. 6, 2008) ..........................8

8

*Bourelle v. Crown Equip. Corp.,*
 220 F.3d 532 (7th Cir. 200) ...........................................................8

9

10

*Cabrera v. Cordis Corp.,*
 134 F.3d 1418 (9th Cir. 1998) ...........................................................17

11

*Culbertson v. Freightliner Corp.,*
 50 F. Supp. 2d 998 (D. Nev. 1999).........................................................20

12

13

*Cummings v. Lyle Indus.*
 93 F.3d 362 (7th Cir. 1996) .............................................................7

14

15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
 43 F.3d 1311 (9th Cir. 1995)("*Daubert II*") ...............................14, 15, 20

16

*Daubert v. Merrill Dow Pharmaceuticals, Inc.,*
 509 U.S. 579 (1993)("*Daubert*") .........................1, 2, 3, 4, 5, 7, 8, 11, 17

17

18

*Domingo ex rel. Domingo v. T.K.,*
 289 F.3d 600 (9th Cir. 2002) ...........................................................5

19

20

*Gen. Elec. Co. v. Joiner,*
 522 U.S. 136 (1997)...................................................................7

21

*Gen. Tel Co. of Sw. v. Falcon,*
 457 U.S. 147 (1982)...................................................................5

22

23

*Guidroz-Brault v. Missouri. Pac. Railroad Co.,*
 254 F.3d 825 (9th Cir. 2001) ...........................................................3, 6

24

25

*Heisler v. Maxtor Corp.,*
 No. 5:06-cv-06634, 2001 WL 1496114 (N.D. Cal. Apr. 11, 2011) .................6

26

*In re Oracle Corp. Sec. Litig.,*
 627 F.3d 376 (9th Cir. 2010) .............................................................4

27

28

*In re Paoli R.R. Yard v. PCB Litig.*,
     35 F.3d 717 (3rd Cir. 1994) ............................................................................21

*Kumho Tire Co. v. Carmichael*,
     526 U.S. 137 (1999)...........................................................................3, 4, 5, 6

*Lust v. Merrell Dow Pharm.*,
     89 F.3d 594 (9th Cir. 1996) ................................................................................4

*O'Hanlon v. Matrixx Initiatives*,
     2007 WL 2446496 (C.D. Cal. Jan. 3, 2007) ........................................................23

*Shalaby v. Irwin Indus. Toll Co.*,
     No. 07CV2107, 2009 WL 7452756 (S.D. Cal. July 28, 2009) *aff'd by Shalaby v.
     Newell Rubbermaid, Inc.*, 379 Fed. Appx. 620 (9th Cir. 2010)............................8, 15

*Thorndike v. DaimlerChrysler Corp.*,
     266 F. Supp. 2d 172 (D. Maine 2003) ...............................................................11

*Trumps v. Toastmaster, Inc.*,
     969 F. Supp. 247 (S.D.N.Y. 1997) ......................................................................7

*Unger v. Amedisys Inc.*,
     401 F.3d 316 (5th Cir. 2005) ...............................................................................5

*United States v. Hermanek*,
     289 F.3d 1076 (9th Cir. 2002) .............................................................................4

*Wal-Mart Stores, Inc. v. Dukes, et al.*,
     _ U.S. _, 131 S. Ct. 2541 (2011) .........................................................................5


**RULES**

Federal Rule of Civil Procedure 23 .......................................................................5

Federal Rules of Evidence 402 .............................................................................1

Federal Rules of Evidence 702 .......................................................1, 3, 4, 5, 6, 17, 21

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO EXCLUDE DECLARATION AND TESTIMONY OF RUSSELL DARNELL

Defendants Harley-Davidson Motor Company Group, LLC, Harley-Davidson, Inc. and Harley-Davidson Motor Company, Inc. (collectively "Harley-Davidson") respectfully submit the following Memorandum of Points and Authorities in support of their Motion to Exclude the Expert Declaration and Testimony of Russell Darnell, pursuant to Federal Rules of Evidence 402 and 702, and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)("*Daubert*").

## INTRODUCTION

In support of their class certification motion, Plaintiffs submitted an expert declaration from Russell Darnell, a claimed motorcycle expert.  However, he is unqualified to offer certain of his opinions, his opinions have no basis in any data or science, he has not conducted any relevant testing to support them, they are based on speculation, and they are unreliable.  While Mr. Darnell generally opines that the Harley-Davidson class motorcycles' engines are all defectively designed because they produce excessive heat that can burn and distract riders, 1) he has not measured the temperatures that a rider would actually experience on any class motorcycle, which he concedes is the <u>only</u> relevant temperature, 2) he does not know what temperatures and what amount of heat are experienced by riders of any class motorcycles, 3) he does not know at what temperatures or conditions riders can sustain burns or become distracted from heat, 4) he concedes he would have to speculate to say that a rider has experienced excessive heat due to a design defect, stating he could list 500 different things that could cause it, 5) he has not evaluated the differences in the design of the numerous different class motorcycles from model to model or from model year to model year, which he concedes can affect heat, 6) he has not evaluated the affect that the modifications Plaintiffs made to their motorcycles have on the heat they claim to experience, 7) he has never tested the effectiveness of EITMS, which is available on all of the numerous models of class motorcycles to manage and reduce engine temperatures, and has no idea how effective it is to manage engine heat, 8) he concedes that motorcycles with air cooled engines are not necessarily

defective and do not necessarily produce excessive heat by virtue of their air cooled design, and 9)

he does not know whether competitors like Yamaha and Suzuki produce air-cooled motorcycles,

or whether they have excessive heat problems, despite opining that they do not.

For these and other reasons discussed herein, Mr. Darnell's opinions are inadmissible.

They are an egregious example of "subjective belief or unsupported speculation" that *Daubert*

provides cannot be admitted as expert testimony.  *Daubert*, 509 U.S. at 590. [1]

## RELEVANT FACTUAL BACKGROUND

In support of their Motion for Class Certification, Plaintiffs proffer the opinions of Russell

Darnell.  As set forth in Darnell's declaration, his opinions with respect to this case are generally

as follows:

> "Harley-Davidson's air cooled design results in excessive heat" which "exposes the rider to excessive heat under reasonably foreseeable operating conditions," and the engines "are defective in design."  (Darnell declaration, ¶¶33, 42)

> The excessive heat "is not normal within the industry."  (Id., ¶38).

> "The excessive heat reaches the point where it poses an unreasonable threat of harm to all riders and has, in fact, caused severe burn injuries to owners/operators/passengers of the product(s)."  (Id., ¶43.)

> "The Motorcycles also present a threat of injury to others by reason of the affect the burning heat has on the safe handling of the Motorcycles by the operators."  (Id., ¶43.)

> "In my opinion the temperatures observed in the test data contained in Harley-Davidson's engineering reports as well as in my own testing are sufficiently high to cause burn injuries of this kind. . . . These burns would not have occurred with a properly designed cooling system."  (Id., ¶46.)

> "Other manufacturers such as Honda, Yamaha, Suzuki, Kawasaki, Ducati, do not have over-heating problems on their touring motorcycles, because they have long ago embraced liquid cooling engine designs for the sake of their customers and the environment."  (Id., ¶55.)

> "Excessive heat can also cause premature wear and failure of clutches and transmissions."  (Id., ¶47.)

---

[1] Darnell's opinions serve as a sole basis for Plaintiffs' theory of a common defect.  Without Darnell's testimony, Plaintiffs cannot sustain their class claims against Harley-Davidson.  *See, e.g., Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010)(vacating class certification motion because plaintiffs' excluded expert formed the "basis of Plaintiffs' theory of defect").

"Harley-Davidson has not cured the design defect with the 'EITMS' modifications." Harley-Davidson's Engine Idle Temperature Management System ("EITMS") "is useless in the real world" and "detrimentally impacts the normal operation of the motorcycle." (Id., ¶¶57, 60-65.)

(A copy of Darnell's declaration was provided to the Court and filed by Plaintiffs, and is under seal.)

Darnell has no basis for any of these opinions. They are based on speculation, he admits it, and they should be excluded.

## LEGAL ARGUMENT

## I.     APPLICABLE LEGAL STANDARD.

With respect to the screening of expert testimony, the Court functions as a "gatekeep[er]." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)(citing *Daubert*, 509 U.S. at 589). The primary objective of this gatekeeping function is to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co*., 526 U.S. at 152.

Rule 702 codifies *Daubert* and "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co*., 526 U.S. at 147 (quoting *Daubert*, 509 U.S. at 589). In determining whether an expert opinion is admissible under Rule 702, a court must engage in a three-step analysis. First, it must ensure that the expert is "qualified." Fed. R. Evid. 702. Second, it must determine whether the expert's analysis is based on scientifically reliable methodology – that is, whether the proffered testimony "relates to scientific, technical or other specialized knowledge which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri. Pac. Railroad Co*., 254 F.3d 825, 829 (9th Cir. 2001). Third, the court must decide whether the testimony will assist the trier of fact in understanding the evidence or in determining a fact at issue. *Daubert*, 509 U.S. at 591.

With regard to the requirement that expert opinions be scientifically reliable, *Daubert* sets forth the following non-exhaustive list of "guideposts:"

(1) whether the scientific theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known potential rate of error when applied; and (4) whether the theory has been "generally accepted" in the scientific community.

*Daubert*, 509 U.S. at 593-94.

In addition to these factors, the 2000 Advisory Committee's Notes to Rule 702 suggest six other benchmarks for gauging expert reliability:

(5) whether "maintenance standards and controls" exist; (6) whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying;" (7) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;" (8) "[w]hether the expert has adequately accounted for obvious alternative explanations;" (9) "[w]hether the expert is being as careful as he would in his regular professional work outside his paid litigation consulting;" and (10) "[w]hether the field of expertise claim by the expert is known to reach reliable results for the type of opinion the expert would give."

Fed. R. Evid. 702 Advisory Committee's Notes (2000 amends.); *see also Lust v. Merrell Dow Pharm.*, 89 F.3d 594, 597 (9th Cir. 1996)(stating the "[o]ne significant fact" is whether the expert "developed his opinions expressly for the purpose of testifying" . . . if these guarantees are not satisfied, the expert "must explain precisely how he went about reaching his conclusions and point to some objective source . . . to show that he has followed the scientific method" . . .)

Although the inquiry is flexible, (*Kumho Tire*, 526 U.S. at 150), there is no presumption of admissibility.  To the contrary, the burden is on the proponent of the evidence to show that the material is admissible as presented.  *See In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010); *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002)("Under Rule 702, the proffered expert  must establish that  reliable principles  and methods  underlie  the  particular

1   conclusions offered"); *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002).[2]

2   ## II.   DARNELL IS NOT QUALIFIED TO GIVE THE OPINIONS HE RENDERS IN
3   THIS CASE.

4           An expert witness must be "qualified as an expert by knowledge, skill, experience,

5   training, or education." Fed. R. Evid. 702.  This means that the party proffering the expert's

6   testimony must prove that he has the requisite "knowledge, skill, experience, training, or

7   education" to render the opinions offered.  *Daubert*, 509 U.S. at 590; *Kumho*, 526 U.S. at 149

8   (stating that an expert must have "a reliable basis in the knowledge and experience of the **relevant**

9
10  **discipline**")(emphasis added).

11          Darnell is a specialist in the field of motorcycles.  A majority of his experience is with

12  motocross and off-road motorcycles.  (Darnell dep., p. 273:2-4; see Declaration of Paul Nystrom,

13  Exhibit A, attaching cited pages from Darnell's deposition.)[3]  He does not have a mechanical

14  engineering degree, and he is not a licensed engineer.  (Id., p. 272:3-6.)  Darnell concedes "I am

15  not a burn expert."  (Id., p. 66:6.)  He concedes that he cannot quantify from a temperature

16  standpoint what constitutes "excessive heat."  (Id., p. 66:1-16.)  While he claims a burn expert
17
18  could, he cannot determine what heat a rider experiences: "[l]ike I said, I think a burn expert can

19  do that.  I have not used thermal couples to see what [heat] gets to the rider."  (Id., pp. 67:22-

20

21  [2] The requirement of *Daubert* and Rule 702 apply with full force at the class certification state.  The "rigorous
    analysis" mandated by Federal Rule of Civil Procedure 23, *Gen. Tel Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982),
22  requires a full *Daubert* inquiry into the reliability of an expert's methodology.  *See Wal-Mart Stores, Inc. v. Dukes, et
    al.*, _ U.S. _, 131 S. Ct. 2541, 2554 (2011)("The District Court concluded that *Daubert* did not apply to the expert
23  testimony at the certification stage of class-action proceedings.  **We doubt that is so** . . .")(emphasis added); *Am.
    Honda Motor Co. v. Allen*, 600 F.3d 813, 815-17 (7th Cir. 2010)("a district court must conclusively rule on any
24  challenge to the expert's qualifications or submissions prior to ruling on a class certification motion"); *Unger v.
    Amedisys Inc.*, 401 F.3d 316, 232 n. 6 (5th Cir. 2005)("[i]n order to consider Plaintiffs' motion for class certification
25  with the appropriate amount of scrutiny, the Court must first determine whether Plaintiffs' expert testimony
    supporting class certification is reliable.")

26  [3] Darnell has offered opinions in a wide variety of other cases opining that defects exist in 1) fences, 2) equipment
27  guards, 3) product warnings, 4) tires, 5) hand tools, 6) construction tools, 7) heavy equipment, 8) bolts, 9) ATVs, 10)
    trailers, 11) trucks, 12) scooters, 13) bicycles, 14) warning signs, and 15) racetrack design and construction.  (Darnell
28  dep., pp. 275:10-276:20.)

68:19.)  He is not qualified and cannot say at what temperature skin can be burned: "I don't know that.  I am not a burn expert."  (Id., p. 88:8-11.)  He does not know what temperature or proximity to an engine is needed to cause a burn, conceding that "I would have to pass that off to a burn expert."  (Id., p. 245:2-8.)  He has not conducted any studies on heat tolerances or heat perception. (Id., p. 138:1-3.)  These are all things that go to the heart of Darnell's opinions, yet he concedes he is not qualified to offer opinions on them.

Based on his own admissions, Darnell is not qualified to offer his opinions in his declaration 1) that the class motorcycles produce "burning heat" (Declaration ¶ 43), 2) that riders of class bikes experience excessive heat (Id., ¶¶ 33, 38), 3) that the heat "poses an unreasonable threat of harm to all riders" (Id., ¶ 43), and 4) that "the temperatures observed in the test data contained in Harley-Davidson's engineering reports as well as in my own testing are sufficiently high to cause burn injuries of this kind."  (Id., ¶46.)  *See Heisler v. Maxtor Corp.*, No. 5:06-cv-06634, 2001 WL 1496114, at *9 (N.D. Cal. Apr. 11, 2011)(finding that plaintiffs did not meet their burden of showing their expert was qualified under Rule 702 because the proffered expert did not have the requisite experience in, and knowledge of, the relevant field).

## III.   DARNELL'S OPINIONS ARE NOT RELIABLE AND ARE BASED ON PURE SPECULATION.

The Courts must determine whether an expert's analysis is based on scientifically reliable methodology – that is, whether the proffered testimony "relates to scientific, technical or other specialized knowledge which does not include unsupported speculation and subjective beliefs." *Guidroz-Brault v. Missouri. Pac. Railroad Co.*, 254 F.3d 825, 829 (9th Cir. 2001).

Here, Darnell's opinions have not been tested, they have not been peer reviewed or published, they do not rely on any recognized standards, he has performed no research independent of this litigation, his opinions were developed exclusively for purposes of this litigation, he has not accounted for hundreds of different alternative explanations for the heat he

claims is excessive, and his opinions are the product of pure unsupported speculation, not based on any scientifically reliable methodology.

### A.      Darnell's Excessive Heat Opinions

Darnell acknowledges that there is no "standard" that addresses an appropriate level of heat in motorcycles.  (Darnell dep., pp. 49:13-50:3.)  However, he defines "excessive heat" as heat that will burn, potentially burn, or distract a rider, that is in a confined space so the rider cannot move away from it.  (Id., pp. 48:8-12)  Darnell testified that he got this definition from the "general population of Harley owners that I've either talked to or read the blogs on or from complaints to Harley and from Harley documents and from measuring heat myself."  (Id., pp. 45:25-46:7)  It is scientifically unsound for an expert to formulate opinions based upon a made-up standard.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

However, Darnell does not even know how much heat riders experience riding Harley-Davidson class motorcycles, and cannot quantify how much heat it takes to become "excessive." (Darnell Dep., pp. 66:1-16, 67:22-68:19, 72:7-17)   His only basis for opining that the class motorcycles create excessive heat to riders and are defective are 1) temperature measurements he took that he concedes are irrelevant, 2) unsubstantiated comments from unknown riders of unknown motorcycles about heat that he characterizes as "fluff," 3) his own limited experiences riding two Harley-Davidson motorcycles, an unknown model in Alaska during a vacation and an unknown model Softail in Idaho in November 2011 to recreate an accident in another case, and 4) four Harley-Davidson documents produced in October and December  2011 that do not support his opinions.  (Id., pp. 45:17-46:11, 69:8-71:22, 72:18-76:15.)

The first and "most significant" *Daubert* factor is whether the proffered opinion has been subject to the scientific method, *i.e.*, testing and retesting of the expert's theories.  *Cummings v. Lyle Indus.* 93 F.3d 362, 368 (7th Cir. 1996); *Trumps v. Toastmaster, Inc.*, 969 F. Supp. 247

(S.D.N.Y. 1997)("[s]ignficantly, [the expert] did nothing to address the 'key question' articulated in *Daubert* of whether his theory of causation 'can be (and has been) tested.'"); *see Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 538 (7th Cir. 200)(holding that the expert's "lack of testing" rendered the expert's opinion "nothing more than speculation"); *Shalaby v. Irwin Indus. Toll Co.*, No. 07CV2107, 2009 WL 7452756, at *7-8 (S.D. Cal. July 28, 2009)(excluding expert's testimony despite satisfaction of some of *Daubert* factors, because expert failed to properly substantiate his opinions with proper testing) *aff'd by Shalaby v. Newell Rubbermaid, Inc.*, 379 Fed. Appx. 620, 622 (9th Cir. 2010); *Avila v. Willits Env't Remediation Trust*, No. C99-3941, 2008 WL 360858, at *12 (N.D. Cal. Feb. 6, 2008)(finding that expert's failure to conduct testing or analysis on *prima facie* plaintiffs in a toxic tort case rendered his opinions regarding those plaintiffs inadmissible).

Here, Darnell did not perform a single test, scientific or otherwise, that supports the opinions rendered in his declaration.   Inexplicably, he never took a single temperature measurement from class representative Weyuker's 2009 Softail.  (Darnell dep. p. 173:9-11)  The only testing Darnell conducted was measuring the temperature of various surfaces of the 2007 Ultras owned by Mr. Aldridge and Mr. Johnson, and various surfaces of a 2006 Honda Goldwing. The results of this testing, set forth in Darnell's declaration, are irrelevant, admittedly useless, and erroneously reported.

Darnell took measurements of the two Ultras and the Honda Goldwing on separate occasions under different test conditions.  (Id., p. 201:11-18, 166:1-20, 204:8-207:9)  Therefore, the temperatures of the Ultras and the Goldwing cannot be compared.  Further, two of the four temperature measurements reported in Darnell's declaration are grossly inaccurate.  Darnell reported in his declaration that the exhaust pipes of the Johnson and Aldridge Ultras were 450 degrees.  (Declaration, ¶34)  However, Darnell's recorded test results show they actually varied

from 189 to a maximum of 298 degrees.   (Darnell dep., pp. 192:22-193:22)   While Darnell reported that the gear box casings were "above 420" degrees, they were actually 282 degrees at their highest measured temperature.  (Id., p. 194:4-8)

Darnell also had no recollection of even taking the "nearly 500º Fahrenheit" measurement described in paragraph 41 of his declaration.  He described this as being equivalent to the broil setting on most ovens.  Yet, he has no notes, photos, record or even recollection of taking this measurement, which according to his declaration was taken a year after his first measurements. (Id., pp. 25:19-22, 197:10-199:4)

Further, Darnell's deposition is replete with testimony about what testing he has *not* done. Darnell *has never*: measured any temperatures of the Softail owned by class representative Matthew Weyuker, measured temperatures of a Harley-Davidson motorcycle that has not been modified, measured temperatures of any air-cooled motorcycle manufactured by someone other than Harley-Davidson, measured temperatures of a Harley-Davidson motorcycle with EITMS, or measured temperatures of any Harley-Davidson motorcycle in Plaintiffs' defined class other than a modified 2007 FLHTCU Ultra.  (Id., pp. 92:23-93:11, 164:1-4, 173:9-174:4.) [4]

However, what is much more critical is that as Darnell concedes, the temperature measurements he did take are meaningless and irrelevant.  Darnell concedes that what is relevant and important is not the temperature of a spark plug or some other surface of a component, which is what he measured.   Riders do not experience those temperatures.   What is relevant and important is the heat or temperatures that riders actually experience when they are riding:

> Q.      [H]eat that a rider would experience.  That's what's important here; right?

---

[4] Darnell testified that he did not take temperature measurements on Weyuker's Softail the day he inspected it because he did not bring his heat gun with him that day.  (Darnell dep., p. 173:9-22.)  Yet, his declaration states that he used his heat gun that same day to measure the temperatures on Aldridge and Johnson's bikes for the second time. (Declaration, ¶41)

1      A.      Yes.

2      Q.      That's what's relevant?

3      A.      Yes

4      (Darnell dep., p. 59:13-19.)

5      Q.      The temperature at a spark plug is not the same temperature that a
               rider of a motorcycle is going to experience, right?

6      A.      True, because it's some distance from them.

7      (Id., p. 60:6-9.)

8      (*See, also*, Id., pp. 62:2-13, 67:22-68:19.)

9           Darnell testified that the only way to determine what heat or temperatures are experienced

10     by riders is to instrument a rider and have them ride a motorcycle in the real world.  (Id., p. 179:2-

11     6.)  He testified "It's the only way."  (Id.)  However, this is testing that Darnell has not done:

12

13     Q.      None of your testing is testing that would quantify the temperatures
               that an actual rider would experience.

14
       A.      That arrive to the rider ?
15
       Q.      Right.  Right.
16
       A.      Like I said, I think a burn expert can do that.  I have not used
17             thermal couples to see what gets to the rider.

18     (Id., p. 68:12-19.)

19                                                  * * *

20     Q.      . . . You measured temperature at component parts, but you never
               measured temperature that a rider would experience riding a
21             motorcycle under normal operating conditions?

22     A.      True.

23     Q.      And you don't know what temperature riders of Harley class bikes
               would be subject to under normal operating conditions?
24
       A.      No.  I just said I've never measured it.  So I haven't done the
25             thermal couple test.

26     (Id., p. 72:8-17.)

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO EXCLUDE DECLARATION AND TESTIMONY OF RUSSELL DARNELL

Therefore, Darnell has not conducted any testing to show what heat is experienced by a single rider on a single class motorcycle, and he does not know.  *See Thorndike v. DaimlerChrysler Corp.*, 266 F. Supp. 2d 172, 176 (D. Maine 2003)(excluding expert's testimony because of his "absence of . . . testing . . . constitutes the sort of analytical gap *Daubert* was intended to prevent").

While Darnell also refers to "average operating temperatures" in paragraphs 38 and 39 of his declaration, those temperatures are also not relevant.  He states that the average operating temperature for Harley-Davidson models is 260 degrees as compared to a claimed average temperature range for cruiser type motorcycles of 190-215 degrees.  While it is unclear from reading his declaration what these temperatures refer to or what Darnell is suggesting by making this comparison, Darnell testified that he obtained these temperatures from motorcycle workshop manuals, which he reviewed online and did not have in his file.  (Darnell dep., p. 209:12-23)  He could not even recall all the models he reviewed.  (Id., pp. 210:6-211:13)  However, Darnell concedes these are nothing more than the operating temperatures of the engines of these motorcycles as specified by the manufacturer.  (Id., pp. 209:24-210:5, 211:17-212:19)  In fact, the 190 – 215 degree range he cites came from measurements of the coolant of liquid cooled motorcycles, which air cooled Harley-Davidson motorcycles do not even have.  In other words, these are not apples to apples comparisons.  (Id.)  In any event, as Darnell concedes, these and other engine temperature measurements are not relevant as they are not the temperatures that a rider experiences.  (Id., pp. 59:13-19, 60:6-11, 62:10-13)

However, even if Darnell had conducted relevant testing and had determined the temperatures that riders of class motorcycles experience, Darnell admits he could not take that information and determine whether the temperatures are excessive, or could burn.  He cannot quantify excessive heat and he has no idea how much heat or what temperatures are "excessive" or

can burn or distract a rider.  (Id., pp. 66:1-16, 88:8-11, 245:2-8.)  Darnell has no basis to offer an opinion that the class motorcycles produce excessive heat that can burn or distract a rider when 1) he has done nothing to support his opinions, 2) he does not know how much heat a rider of any class motorcycle experiences, and 3) he does not know how much heat and under what circumstances are required to distract or burn.

Having performed no testing or analysis to support his opinions, Darnell attempts to rely on documents produced by Harley-Davidson.  Darnell asserts that Harley-Davidson's own documents show that "Harley-Davidson knew that its air cooled design caused excessive heat." (Declaration, ¶50)  Darnell cites to three engineering reports and a test incident report produced by Harley Davidson in October and December 2011.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO EXCLUDE DECLARATION AND TESTIMONY OF RUSSELL DARNELL



None of the documents relied on by Darnell suggest that Harley-Davidson ever had any safety concern with respect to any model.  But more importantly, Darnell has made no attempt to determine whether Harley-Davidson's concerns, whatever their nature, apply to the motorcycle owned by the purported class representative, let alone to all 130+ configurations of class vehicles. (Darnell dep., pp. 135:6-13, 174:1-4)  These documents do not support Darnell's opinions.

Darnell's opinions are not the product of any independent research and have not been subjected to independent scientific scrutiny or peer review.  (Darnell dep., p. 32:9-11.)  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995)("*Daubert II*"), the Ninth Circuit emphasized that the role of "independent research" in evaluating the reliability of an expert's methodology, counseling that it is incumbent upon lower courts to consider whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of litigation, or whether they have developed their opinions expressly for the purposes of testifying." *Daubert II*, 43 F.3d at 1317.  In the event that an expert's testimony is not based on independent research, the "proponent of the evidence 'must come forward with other

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO EXCLUDE DECLARATION AND TESTIMONY OF RUSSELL DARNELL

objective, verifiable evidence that the testimony is based on scientifically valid principles,'" such as proof that the research and analysis has been "subjected to normal scientific scrutiny through peer review and publication."  *Id*. at 1318 (citations omitted).  S*ee Shalaby v. Irwin Inds. Toll Co.*, No. 07CV2107, 2009 WL 7452756, at *7 (S.D. Cal. July 28, 2009)(noting that the fact that an expert's report has not been peer-reviewed "cuts against" a finding that the expert's theories are reliable).  Darnell has not done this.

Darnell, therefore, has no basis to opine that:

"Harley-Davidson's air cooled design results in excessive heat" which "exposes the rider to excessive heat under reasonably foreseeable operating conditions," and the engines "are defective in design."  (Declaration, ¶¶33, 42)

"The excessive heat reaches the point where it poses an unreasonable threat of harm to all riders and has, in fact, caused severe burn injuries to owners/operators/passengers of the product(s)."  (Id., ¶43)

"The Motorcycles also present a threat of injury to others by reason of the affect the burning heat has on the safe handling of the Motorcycles by the operators."  (Id., ¶43)

"In my opinion the temperatures observed in the test data contained in Harley-Davidson's engineering reports as well as in my own testing are sufficiently high to cause burn injuries of this kind. . . . These burns would not have occurred with a properly designed cooling system."  (Id., ¶46)

Darnell offers these opinions without any reliable data, testing or analysis to support them. His opinions are pure speculation and they should be excluded.

**B.    Darnell's Opinion That A Liquid Cooled Design Or Retrofit Is Needed To Address Engine Heat**

Throughout his declaration, Darnell states that a liquid cooled design is required to effectively manage engine heat because air cooled engines are no longer capable of doing so.  He indicts air cooled engines repeatedly.  Darnell offers only one alternative design – to dramatically alter Harley-Davidson motorcycles, including their look, sound, feel, smell and tradition, by designing them with liquid cooled engines.  However, during his deposition, Darnell conceded that liquid cooled engines are not required to effectively manage heat.  For example, Darnell

testified that Yamaha's current air-cooled touring motorcycle is not defective.  (Darnell dep. p. 89:2-15)  Darnell believes that while air cooled, it is not defective because it may have a "little bit different cylinder arrangement."  (Id. p. 89: 10-15)  Darnell also testified that Yamaha and Suzuki air cooled motorcycles may not produce excessive heat and, therefore, would not be defective.  (Id. p. 91:15-21)  "They obviously have a different system than Harley does."  (Id. p. 92:17-22)

Darnell also testified "[I]'m not saying [Harley-Davidson] shouldn't sell an air-cooled machine."  (Id., p. 264:16-17)  In fact, he believes that Harley-Davidson could redesign its air-cooled engines to adequately address engine heat.  However, focused instead on financial and business reasons that he knows nothing about, Darnell testified that "it would make - - financially more sense to design a water-cooled version than to redesign the vertical twin [engine] in the same configuration that it is . . . from a business case it doesn't make any sense at all . . ."  (Id., p. 264:1-19)

Darnell cannot reliably offer an opinion that Harley-Davidson must retrofit its motorcycles with liquid cooled engines when he believes that its air cooled engines can be designed so they do not produce alleged excessive heat and, therefore, are not defective.

C.    **Darnell's Opinions Regarding EITMS.**

Darnell's opinion that EITMS is useless is not supported by any testing or studies and is based solely on speculation.  EITMS operates to manage engine temperatures in stop and go traffic and idle condition, the very conditions that Plaintiffs complain about in their complaint.  (Fourth Amended Complaint, ¶¶ 15, 39, 45, 47.)  Each of the four Plaintiffs have had EITMS readily available to them to be installed free of charge by a quick trip to a dealership service department.  Amazingly, none of them has done so.  While Darnell measured the temperatures of the Aldridge and Johnson bikes at idle – a condition in which EITMS would be activated and would shut off the rear cylinder – he did not bother to take any temperature measurements with EITMS activated and

he has done absolutely nothing to attempt to determine the effectiveness of EITMS.  (Darnell dep. pp. 215:7-13, 230:4-6)

Darnell tries to dismiss EITMS as an effective tool to manage heat.  However, he does not know how much heat riders experience on a class motorcycle either with or without EITMS.  He opines that Harley-Davidson should retrofit all of its tens of thousands of air-cooled motorcycles with liquid-cooled engines without even first analyzing the effectiveness of a free, and readily available system that achieves reduction in engine temperatures.

In addition to conducting no testing relating to EITMS, Darnell does not rely on any studies, testing or analysis performed by others, including Harley-Davidson.  In his declaration, Darnell states that he is not aware of any documentation that shows the effectiveness of EITMS. (Declaration, ¶¶ 60-61.) ████████████████████████████████

████████████████████████████████████████████

His opinion is based solely on his experience working on motorcycles and waiting for parts to cool before he touches them.  (Declaration, ¶62)  As described in the service bulletins attached as Exhibit 8 to Darnell's declaration, EITMS acts as an air pump to cool the engine, and is designed to prevent further increases in engine temperature, not simply to reduce temperatures. Darnell's experience can hardly be applied to determine the effectiveness of EITMS in the real world.  Darnell's opinion based on such "unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion under *Daubert* and Rule 702." *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998)(excluding expert's testimony that shunt was defective because it contained inappropriate amount of silicon when the expert testified that he had never tested any shunts and that no research of peer-reviewed articles supported his views).

While Darnell also opines that EITMS "detrimentally impacts the normal operation of the Motorcycles" (Declaration, ¶65), his sole basis for this opinion is his review of online blogs and

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO EXCLUDE DECLARATION AND TESTIMONY OF RUSSELL DARNELL

talking with people whose names he does not know who claim to own unknown Harley-Davidson model motorcycles with unknown modifications and maintenance history.   (Darnell dep. pp. 242:20-245:1.)    He concedes he has done nothing to verify this information.  He characterizes it as "anecdotal," stating "I'm not relying on it," "It's just talk," and "It's just fluff."  (Id., pp. 29:13-30:1.)  Darnell has not performed any testing or analysis to quantify or determine any alleged drivability issues caused by EITMS.  (Id., p. 244:2-8.)

Therefore, Darnell's opinions regarding EITMS should be excluded.

### D.   Darnell's Opinion That Excessive Heat Causes Premature Wear And Tear Of Mechanical Systems.

Darnell's opinion that "excessive heat causes or contributes to premature wear and failure of mechanical systems" similarly lacks any basis.  (Declaration, p. 12)  As discussed, Darnell does not know whether the temperatures he measured on the various engine components of Aldridge and Johnson's Ultras are within a normal range for an engine, below normal, or "excessive."  He has no basis to say that these engine temperatures create "excessive heat" that could even cause any premature wear and tear.

Darnell relies on an inspection he performed of the transmission oil in Mr. Aldridge's 2007 Ultra in February 2011.  Darnell claims he simply looked at the transmission oil, and stuck his finger in it.  He claims that based solely on this inspection, he could determine that the oil was degraded due to excessive heat.  (Declaration, ¶49.)  However, he has no idea what type of oil it was, he has not obtained or reviewed the oil's specifications, he does not know when it was last replaced, and he did not have it analyzed or tested.  (Darnell dep., pp. 42-44)  He never compared the oil to its original specifications, and never determined the presence of contaminants, oxidation levels, and other necessary information to be able to determine its condition. (Darnell dep., pp. 41:20-42:3, 43:20-44:20.)  Without such an analysis, he cannot opine about the condition of the oil or its cause.  (See Thomas McGowan Declaration, ¶10.)

In addition to inspecting the transmission oil, Darnell also removed and replaced the transmission and the oil from Aldridge's motorcycle.  (Darnell dep. pp. 37:6-39:25)  Incredibly, Harley-Davidson was given no notice of this destructive alteration and testing of the motorcycle when Plaintiffs allege in their Complaint that the class motorcycles' transmissions are defective independent of their heat claim.  (Plaintiffs' Fourth Amended Complaint, ¶¶ 1, 21.)  Not only was Harley-Davidson given no notice of these alterations of the Aldridge motorcycle, Harley-Davidson was precluded from even learning about them until Darnell's deposition on March 6, 2012.  The removed transmission and the oil Darnell inspected were not made available at Harley-Davidson's inspection in June 2011.  (McGowan declaration, ¶4.)  Plaintiffs' counsel also refused to allow Harley-Davidson's counsel to ask Mr. Aldridge about the transmission replacement during his deposition, claiming work product protection:

> Q.    Well, what has happened to your transmission since August 25, 2010?
>
> MR. KERSHAW: Again, I'm going to assert the work product privilege and direct the witness not to answer.
>
> (Aldridge dep., p. 135:8-12; see Declaration of Paul Nystrom, Exhibit A, attaching cited pages from Mr. Aldridge's deposition.)

Darnell took no photographs of the oil.  Despite videotaping the inspection of the transmission, neither the oil nor the replacement of the transmission were taped.[5]

Further, even if Darnell could establish that the transmission oil in Aldridge's 2007 Ultra was degraded as a result of engine heat, he cannot say whether that heat was caused by the engine's design, the modifications made to the motorcycle, or any number of other possibilities.  According to Darnell, he can identify 500 possible explanations for excessive heat.  (Darnell dep., pp. 111:15-112:4)  Further, Darnell cannot offer any opinions about any of the other numerous models of class motorcycles.  He cannot say whether those models produce excessive heat and,

---

[5] Harley-Davidson will provide a copy of the video if requested by the Court.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO EXCLUDE DECLARATION AND TESTIMONY OF RUSSELL DARNELL

therefore, whether they are subject to premature wear and tear.  (Id., pp. 174:1-4, 135:6-13)  Darnell has never analyzed the transmission or transmission oil of a class motorcycle other than a 2007 Ultra.  In fact, Aldridge's motorcycle is not even in the class Plaintiffs define.

### E.   Darnell Lacks Any Basis To Compare The Class Motorcycles To Other Manufacturers' Motorcycles.

Darnell states in his declaration that "[o]ther manufacturers such as Honda, Yamaha, Suzuki, Kawasaki, Ducati, do not have over-heating problems on their touring motorcycles, because they have long ago embraced liquid cooling engine designs for the sake of their customers and the environment." (Declaration, ¶55)  Yet Darnell admits he has no basis for this statement.  Darnell does not even know if Yamaha or Suzuki produce air cooled motorcycles or whether, if they do, they have excessive heat problems.  (Darnell dep. pp. 89:2-93:11.)  He is not familiar with them, and he has not performed any evaluation of Yamaha, Suzuki, or Victory motorcycles.  "I am saying I don't know enough about the bike to opine on it, the other machines."  (Id., p. 91:13-14.)  "I would say they would not be defective if they are not creating excessive heat.  I am saying I don't know."  (Id., p. 91:15-21)

Darnell is making statements and offering opinions about other manufacturers' motorcycles when he admits he knows almost nothing about them, has performed no analysis or testing of competitors' liquid or air-cooled motorcycles, and has no idea whether they have problems with heat.  This is yet another egregious example of Darnell offering an opinion for which he has absolutely no basis, simply because it helps Plaintiffs' claims.

At their core, Darnell's opinions are unproven assertions.  Darnell's assumption are not scientific knowledge, merely because they are uttered by an expert.  *Daubert II*, 43 F.3d at 1315-16; *see also Culbertson v. Freightliner Corp.*, 50 F. Supp. 2d 998, 1000 (D. Nev. 1999)(excluding expert's testimony because "[t]he knowledge [the expert] offer[ed] to the trier of fact, however, is

1   no more than his opinion on how one might cure a defect that he assumed, but has never showed,

2   existed").

3   **IV.   DARNELL DID NOT RELIABLY APPLY HIS OPINIONS TO THE FACTS OF**
4   **THIS CASE OR ACCOUNT FOR ALTERNATIVE EXPLANATIONS FOR THE**
     **HEAT.**

5          Even if Darnell's "excessive heat" opinions could somehow be deemed reliable (which

6   they are not), his application of his "opinions" to the facts of this case is severely flawed.

7
8   Misapplication of a methodology, even if sound, provides an independent basis for exclusion. *See*

9   Fed. R. Evid. 702, Advisory Committee's Note (2000 amends.)(the court "must scrutinize not only

10  the principles . . . used by the expert, but also whether those principles . . . have been properly

11  applied to the facts of the case"); *In re Paoli R.R. Yard v. PCB Litig*., 35 F.3d 717, 745 (3rd Cir.

12
13  1994)(explaining that "any step that rendered the analysis unreliable . . . renders the expert's

14  testimony inadmissible" regardless of "whether the step completely changes a reliable

15  methodology or merely misapplies that methodology").

16         Darnell misapplied his opinions because: 1) he has not analyzed or tested the over 100

17  different models of class motorcycles that have different designs, and 2) he has failed to consider

18  the numerous variables that may affect heat in an individual motorcycle.

19         **A.    Darnell Cannot Apply His Excessive Heat/Design Defect Opinion To Over 100**
20                **Model Motorcycles.**

21         Darnell opines that all class bikes contain a common design defect in the form of excessive

22  heat.  However, Darnell never analyzed the various differences in *any* of the 130 configurations of

23  class vehicles from model to model or year to year.  Darnell concedes that the amount of heat

24  experienced by riders depends on the design of the motorcycle, and "there are too many variables

25  to opine on."  (Darnell dep., pp. 134:22-135:13.)

26
27         Thus, even if Darnell had a basis to opine that Johnson's 2007 Ultra is defective, that

28  would not allow him to then speculate that any of the other 129 configurations are defectively

designed, because all of those other configurations have different designs that must be individually considered.   Indeed, even answering the design defect question as to Class Representative Weyuker's 2010 Softail Cross Bones – which Darnell never tested – would not even answer the question with respect to class member Johnson's 2007 Touring Ultra Classic.   Darnell certainly cannot offer an opinion that any class motorcycles with EITMS are defective because he has never analyzed the effect EITMS has on heat.   The question of design defect is not common to all the class motorcycles, and Darnell has performed no work whatsoever on any models beyond the modified 2007 Ultra that he took irrelevant temperature measurements from.

**B.**     **Darnell Did Not Account For Other Factors That Could Affect Heat.**

Darnell also does not account for the numerous variables that influence motorcycle heat in the field, including, but not limited to: rider experience, rider skill, rider size, rider weight, types of after-market accessories on the motorcycle, model of motorcycle and its design, modifications, clothing worn, and motorcycle maintenance, all of which Darnell admits can affect heat.   (Darnell dep. pp. 67:22-68:19, 111:2-112:13, 120:22-121:17, 131:20-132:1, 133:8-12, 136:13-21, 137:3-8, 255:21-256:1)

> Q.     One of the explanations for this variability is that there are a lot of different factors that go into whether or not a rider will, in fact, experience a certain amount of heat?
>
> A.     Yes.
>
> (Id., pp. 120:22-121:1)

When asked how Mr. Johnson could own a 2007 Ultra, have no heat issues at all for eight months, and then purchase the same model and experience excessive heat, Darnell could not explain it.   However, he conceded that "it would be wild speculation to say it could have been this or that.  I could probably list 500 different things."  (Id., pp. 109:24-112:4)  Darnell has not ruled out any of the "500 different things" that could account for the heat complaints from Plaintiffs and

1 | cannot reliably point to the engine's design as the cause, conceding the unreliability of his

2 | opinions.

3 | 　　　　Failure of experts to account for alternative explanations renders there testimony unreliable

4 | and inadmissible.  *See, e.g., O'Hanlon v. Matrixx Initiatives*, 2007 WL 2446496, at *3 (C.D. Cal.

5 | Jan. 3, 2007)(excluding experts' testimony because experts failed to account for alternative causes

6 | 

7 | of plaintiff's symptoms).

8 | **CONCLUSION**

9 | 　　　　For all of the foregoing reasons, Darnell's opinions and testimony are inherently flawed,

10 | unreliable and are based on pure speculation.  Accordingly, the Court should exclude them.

11 |

12 | 　　　　　　　　　　　　DYKEMA GOSSETT LLP

13 |

14 | 　　　　　　　　　　　　By:/s/ *Paul L. Nystrom*
　　　　　　　　　　　　　　　Paul L. Nystrom (admitted *pro hac vice*)

15 | 　　　　　　　　　　　　　　　pnystrom@dykema.com
　　　　　　　　　　　　　　　39577 Woodward Ave., Suite 300

16 | 　　　　　　　　　　　　　　　Bloomfield Hills, MI 48304

17 | 　　　　　　　　　　　　　　　Peter M. Kellett (admitted *pro hac vice*)
　　　　　　　　　　　　　　　pkellett@dykema.com

18 | 　　　　　　　　　　　　　　　400 Renaissance Center, Suite 2300
　　　　　　　　　　　　　　　Detroit, MI 48243-1668

19 | 　　　　　　　　　　　　　　　John M. Thomas (SBN 266842)

20 | 　　　　　　　　　　　　　　　jthomas@dykema.com
　　　　　　　　　　　　　　　2723 South State Street, Suite 400

21 | 　　　　　　　　　　　　　　　Ann Arbor, MI 48104

22 | 　　　　　　　　　　　　　　　J. Kevin Snyder (SBN 107509)
　　　　　　　　　　　　　　　ksnyder@dykema.com

23 | 　　　　　　　　　　　　　　　333 South Grand Avenue, Suite 2100
　　　　　　　　　　　　　　　Los Angeles, California 90071

24 | 　　　　　　　　　　　　　　　Attorneys for Defendants  HARLEY-
　　　　　　　　　　　　　　　DAVIDSON MOTOR COMPANY GROUP, LLC,

25 | 　　　　　　　　　　　　　　　HARLEY-DAVIDSON, INC. and HARLEY-
Dated: March 26, 2012　　　DAVIDSON MOTOR COMPANY, INC.

26 |

27 |

28 |