IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---o0o---

BEFORE THE HONORABLE JOHN A. MENDEZ, JUDGE

---o0o---

PHILLIP JOHNSON, JIMMY ALDRIDGE,
RANDY VANDERMOLEN, and MATTHEW
WEYUKER, individually and on
behalf of all others similarly
situated,
          Plaintiffs,

vs.                                          No. Civ. S-10-02443

HARLEY-DAVIDSON MOTOR COMPANY
GROUP, LLC; HARLEY-DAVIDSON,
INC., which will do business
in California as: (WISCONSIN)
HARLEY-DAVIDSON, INC.;
HARLEY-DAVIDSON MOTOR COMPANY,
INC., and DOES 1-50,
          Defendants.

_____/


---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION FOR CLASS CERTIFICATION

WEDNESDAY, MAY 2, 2012

---o0o---


Reported by:   KATHY L. SWINHART, CSR #10150

1                          APPEARANCES

2

    For the Plaintiffs:
3
            KERSHAW, CUTTER & RATINOFF
4           401 Watt Avenue
            Sacramento, California  95864
5           BY:    WILLIAM A. KERSHAW

6
    For the Defendants:
7
            DYKEMA GOSSETT PLLC
8           2723 South State Street, Suite 400
            Ann Arbor, Michigan  48104
9           BY:    JOHN MARK THOMAS

10                   and

11          DYKEMA GOSSETT PLLC
            39577 Woodward Avenue, Suite 300
12          Bloomfield Hills, Michigan  48304
            BY:    PAUL L. NYSTROM
13                 Pro Hac Vice

14

15

16

17

18

19

20

21

22

23

24

25

1          SACRAMENTO, CALIFORNIA

2        WEDNESDAY, MAY 2, 2012, 10:48 A.M.

3                  ---o0o---

4          THE CLERK:  Civil S-10-2443, Johnson, et al., versus

5    Harley-Davidson, Incorporated, et al.

6          MR. KERSHAW:  Good morning, Your Honor.  Bill Kershaw

7    on behalf of the class proponents.

8          MR. THOMAS:  John Thomas and Paul Nystrom for

9    Harley-Davidson, defendants.

10          THE COURT:  Okay.  There are two motions on this

11    morning.  The Court issued a minute order with respect to the

12    motion for summary judgment, which I granted the motion to

13    defer any consideration of that motion.  You can tell from my

14    minute order, Mr. Thomas and Mr. Nystrom, that not only did I

15    think you should have informed Mr. Kershaw of your strategy in

16    filing motions, but you've got to give the Court a heads up if

17    you're going to file such a significant motion.  And I know it

18    cuts against full disclosure and strategy sometimes.  But if

19    you expect courts, especially the court that's the busiest in

20    the country, to try to decide a class cert and a summary

21    judgment motion on the same day, it's not going to happen in

22    the Eastern District of California.

23          I like attorneys that believe so strong in their case

24    that they have no problem fully disclosing what their strategy

25    or plans are.  And both of you are excellent attorneys, and

1    that's the way I would expect this case to be approached.  So

2    that was the thinking, and you can tell from my minute order,

3    behind not granting your request that I consider your summary

4    judgment motion.  Those are difficult motions for courts to

5    decide.  And if you want to try to combine that with a motion

6    in which you're opposing class certification, that's not going

7    to happen, at least not in this district.  I don't know many

8    districts that would happen in.

9         So we'll leave it at that, we're not going to talk

10   about it, we're not going to consider it.  It's been deferred.

11   So let's focus on the class cert.

12        Along with the class cert motion, the defendants did

13   file a motion concerning the declaration submitted in support

14   of the motion for class certification.

15        It's always interesting to me, and I'm not sure

16   whether -- was Mr. Darnell deposed before the declaration was

17   filed?  Or was he deposed after?

18        MR. KERSHAW:  Afterwards, Your Honor.

19        THE COURT:  Okay.  That explains this.  It's always

20   interesting to me to get declarations when someone has been

21   deposed.  But, be that as it may, I'll take it up that motion

22   first in terms of whether I should strike Mr. Darnell's

23   declaration.

24        In response to the motion to exclude, the

25   plaintiffs -- plaintiff now has agreed and has withdrawn

1    paragraphs 33, 34, 38, 42, 43, and 46, which are in effect

2    substantive, very substantive paragraphs that go to the heart

3    or the merits of this case.  But in the opposition, since this

4    really isn't a merits resolution type motion, Mr. Kershaw has

5    agreed to withdraw those and has asked the Court simply to

6    consider this declaration for the sole purpose of the issues

7    raised by the motion for class certification.

8           And so, for that limited purpose, I will and have

9    considered Mr. Darnell's declaration.  Although frankly, when

10   you agree to eliminate those paragraphs, there really isn't

11   much left other than what he's done personally.

12          But to the extent, Mr. Kershaw, I see you sliding over

13   into a merits type argument or relying on Mr. Darnell for some

14   type of merits resolution or a response to declarations

15   submitted by the defendants, I'm going to cut you off because

16   those paragraphs have been excluded.

17          MR. KERSHAW:  I would agree, Your Honor.

18          THE COURT:  Okay.  So I'm in effect granting the

19   motion to exclude and denying the motion to exclude the

20   declaration in its entirety.  And the declaration has and will

21   only be considered by the Court to the extent that it does add

22   anything to the discussion concerning the issues raised by the

23   class certification motion.

24          All right.  The proposed class in the motion to

25   certify this class is as follows:  All persons who between

1    October 1st, 2006, and the date the class may be certified,

2    purchased in California a motorcycle manufactured by the

3    defendants with an air-cooled 88, 96, 103 or 110 cubic inch

4    V-Twin Cam engine.

5           And out of the box, the defendants point out in a

6    footnote -- hang on.  It's footnote 2, Mr. Kershaw.  They say

7    plaintiffs' class certification motion expands the class

8    definition to include California purchasers of 103 and 110

9    cubic inch engines, but the Court is bound by the class

10   definition provided in the complaint, citing Berlowitz versus

11   Nob Hill Masonic Management, a Northern District case from

12   1996.  And, therefore, Harley-Davidson will address only the

13   class alleged in the complaint.

14          You didn't respond to that specifically, but usually

15   when someone doesn't respond, I take it as a concession that

16   you agree that you can't include the 103 and 110 cubic inch

17   V-Twin Cam engines in your class --

18          MR. KERSHAW:  Your Honor, I --

19          THE COURT:  -- unless I grant a motion to amend.

20          MR. KERSHAW:  Exactly.  And let me just give the

21   Court, if I could, a little history on this.  And this was

22   with respect to Mr. Wiens, Richard Wiens, who is a class

23   member who has provided the Court with both a declaration,

24   whose deposition was taken and who owns a 110 CVO, kind of

25   Harley-Davidson top of the line motorcycle.

1          And I had -- you know, when he came -- I became aware

2     of him, I contacted Mr. Nystrom, and I said, you know, look, I

3     want to -- I'd like to amend the complaint to include the

4     110s, all of the V-Twins, the whole line of V-Twin Cam

5     engines.  Because, as the power is increasing and the

6     emissions standards are requiring a leaner mixture, these

7     bikes are becoming more and more problematic with respect to

8     this heat issue, this excessive heat issue.  And we went kind

9     of round and round about it, and ultimately, I mean, he

10     refused to allow me to do that.

11          And so I was sitting there thinking, well, should I

12     run into court and try to bring another motion?  Or should we

13     present his testimony in conjunction with the certification

14     motion and seek to define the class as we have?  And if the

15     Court is inclined to allow it because of the nature of this

16     subject matter, because of the V-Twin Cam design being at the

17     heart of this case, then the Court could direct me to amend my

18     complaint, amend the motion or bring in Mr. Wiens as a

19     representative plaintiff.

20          And so we are --

21          THE COURT:  Who's the representative plaintiff for the

22     103?

23          MR. KERSHAW:  Well, Your Honor, I don't believe we

24     have to have a representative plaintiff for every single -- I

25     can get a representative plaintiff for the 103 if the Court

1    would like me to.  That's --

2         THE COURT:  You don't have one now?

3         MR. KERSHAW:  I don't have one -- well, I have -- the

4    answer is I have people who have 103s who could serve as a

5    representative plaintiff.  But, you know, when you start

6    loading up more people, representative plaintiffs, things get

7    more complicated, and so I hadn't done that.

8         But I believed having a representative plaintiff from

9    one end of the spectrum basically to the 96, which is where

10   the problem really started manifesting itself here --

11        THE COURT:  Neither Aldridge, Johnson or Vandermolen

12   had a 103 or a 110, though, right?

13        MR. KERSHAW:  That's correct.

14        THE COURT:  And Mr. Weyuker has a --

15        MR. KERSHAW:  96.

16        THE COURT:  -- 96.

17        MR. KERSHAW:  Right.

18        THE COURT:  Was there at any time someone who had the

19   88 cubic inch?

20        MR. KERSHAW:  These gentlemen have owned that in the

21   past, Your Honor.  But, no, not at this time.

22        THE COURT:  Okay.  Well, you're not disagreeing with

23   the footnote.

24        MR. KERSHAW:  I'm -- I'm not disagreeing with the

25   footnote.  I'm -- it's kind of guilty with an explanation, I

1    guess.

2           THE COURT:  Okay.  And then so we're clear, Aldridge

3    Johnson, and Vandermolen are no longer proposed class

4    representatives.  They're -- in effect they've dropped out of

5    this lawsuit?

6           MR. KERSHAW:  That is correct, Your Honor.

7           THE COURT:  So what do I do, though, with someone like

8    Mr. Johnson, who technically if I certify the class would be a

9    member of the class?  How do I deal with an issue of someone

10   who was a plaintiff, he would be a member of the class, but

11   then now doesn't want to be a member of the class?  Should I

12   ignore that?

13          MR. KERSHAW:  Well, Your Honor, I think in part the

14   answer is and the argument was that, you know, there were

15   statute of limitations issues that related to Aldridge and

16   Johnson.  And as to Vandermolen -- well, you asked about Mr.

17   Johnson.

18          THE COURT:  Johnson is the only one.  Vandermolen

19   would be outside your class because he purchased his

20   motorcycle in August of 2006, and Aldridge would be out

21   because he purchased his motorcycle in September of 2006.  I

22   want to focus on Johnson.  He purchased the 2007 Ultra in

23   August of 2007, so he clearly would be within the class.

24          MR. KERSHAW:  The argument is, Your Honor, that he was

25   aware -- I didn't want to get involved with statute of

1    limitations issues as to a representative plaintiff.  And

2    consequently there were all sorts of arguments with respect to

3    Mr. Johnson on that issue, and so that was just not something,

4    because of the individual nature of those arguments and

5    issues, that I wanted to get into.

6         THE COURT:  That was the deposition testimony where

7    first he said that he did suffer burns, and then he came back

8    and said I didn't suffer burns?

9         MR. KERSHAW:  Yes, Your Honor.

10        THE COURT:  Okay.  All right.

11        MR. KERSHAW:  As an explanation to the Court, Your

12   Honor, there were some serious issues of memory there.

13        THE COURT:  I think defense counsel would disagree

14   with you, but I'm not --

15        MR. KERSHAW:  I'm sure defense counsel would.

16        THE COURT:  -- I'm not going to get into that.

17        MR. KERSHAW:  Okay.

18        THE COURT:  Okay.  Mr. Thomas, your opposition comes

19   out mentioning that if I certify this class, it would involve

20   130 different models that would fit within the class

21   definition.  Let's see.  You say 130 -- actually two different

22   engines and more than 130 different Harley-Davidson

23   motorcycles that present an unreasonable risk of burns to

24   users.

25        And the response in the reply, and it's a question I

1  have for you, is all of these models or all of these

2  configurations, though, still use the same engine design,

3  right?  It's still an air-cooling V-Twin Cam engine.  So while

4  you may have 130 different models, the design that's at issue

5  is identical.

6          MR. THOMAS:  Ah, no.  First of all, of course, there

7  are -- ignoring the 103s and the 110s, there are two different

8  size engines which are obviously differently designed because

9  one is bigger than the other, and Darnell concedes that bigger

10  engines generate more heat.  But, beyond that, the heat that

11  reaches -- the evidence on this basically is undisputed now

12  that Darnell's testimony on the relevant points has been

13  withdrawn.

14          The heat that reaches the rider depends on much more

15  than the engine design.  It depends on things like, for

16  example, the -- the placement of the seat, the existence of

17  farings, the existence of saddle bags.

18          THE COURT:  I understand that.  Let me try my question

19  again.  Maybe it wasn't clear.

20          If we had 130 different engines in this courtroom,

21  wouldn't it be true, though, that all of those engines use an

22  air-cooling design?

23          MR. THOMAS:  Yes.

24          THE COURT:  Okay.  And that's in effect what the

25  plaintiff is alleging is the defect.

1      MR. THOMAS:  No, it's not actually.

2      THE COURT:  That there should be -- I mean, their

3    simplistic response is it should be liquid-cooled, not

4    air-cooled.  But every one of those 130 configurations or

5    models do use an air-cooled or an air-cooling system, correct?

6    Not a liquid-cooling, they use an air-cooling system.

7      MR. THOMAS:  That's correct, but --

8      THE COURT:  Just focusing on the 88 and the 96 cubic

9    inch.

10     MR. THOMAS:  Right, but that -- but plaintiffs say

11   expressly in their reply brief that the common defect is not,

12   as Harley-Davidson wrongly argues, that air-cooling systems

13   are per se defective.  And Darnell conceded that there are

14   air-cooling systems that are not defective.  So the theory

15   here is not the air-cooling systems are per se defective.

16     THE COURT:  So what's the defect, Mr. Kershaw, if it's

17   not the air-cooling system?

18     MR. KERSHAW:  Well, Your Honor, the defect is that

19   this motorcycle, as designed, with the V-Twin that is

20   air-cooled, is producing excessive heat because the emissions

21   standards over time have become more and more strict,

22   requiring a leaner and leaner mixture.  And if the bike is

23   stock, if it -- and this is a big issue in the case, Your

24   Honor, that I'm going to ask the Court to come to grips with.

25   Is that if it is modified with whether it's a Super Tuner,

1    whether it's pipes, whatever it is, most of the modifications

2    take place to deal with this heat issue.

3         And so the defect is that it's air-cooled with the

4    current emissions standards that are extant in California and

5    that, as such, it runs too hot.  There is excessive heat

6    coming off of it.  That is the defect.

7         THE COURT:  It sounds to me like you just said the

8    defect is the air-cooling system.

9         MR. KERSHAW:  Well, it's the -- it's not so much the

10   air-cooling system, it's the cooling system.  The cooling

11   system is defective.  Whatever system you want to call it, the

12   cooling system on all these motorcycles -- it happens to be

13   air so, yes, in this instance it's air -- is defective.  But

14   it's the cooling system.

15        THE COURT:  You submit, Mr. Thomas, on behalf of your

16   client, a number of declarations from experts hired -- and in

17   part I think you probably submitted declarations in support of

18   the summary judgment motion, but to the extent they go to the

19   class certification motion -- which in summary involve these

20   experts that you would use testing these models and then also

21   models from other manufacturers.

22        And the plaintiffs' response to that in the reply is,

23   thank you for submitting those declarations.  What it proves

24   is that there really is a basis for proving the allegations in

25   this case by way of generalized evidence.  All we have to do

1    is bring experts in here who can then battle in front of a

2    jury as to whether there really is a problem with these

3    engines or not.  And so I wanted you to respond to that

4    argument in the reply brief.

5           MR. THOMAS:  Sure.

6           What the plaintiffs have done is backed off, withdrawn

7    Darnell's testimony that all of these motorcycles have a

8    common design defect that all produce excessive heat in favor

9    of a position that says there is a common test that can be

10   used to determine whether each of these configurations of

11   motorcycles generate excessive heat.

12          In fact what Darnell says is, in paragraph 26 of his

13   supplemental declaration, where he says where there is --

14          THE COURT REPORTER:  Please slow down.

15          MR. THOMAS:  I'm sorry.  I told my client I would

16   speak too fast, and here I am doing it.

17          He says in paragraph 26 of his declaration that

18   Harley-Davidson's testing shows that there is a reliable

19   testing methodology that can be, quote, applied across a

20   large, large cross-section of different configurations to

21   generate a common body of data that will show how the heat

22   experienced by the rider varies --

23          THE COURT:  What paragraph are you looking at?

24          MR. THOMAS:  Paragraph 26 of his supplemental

25   declaration.

1      THE COURT:  Oh, the supplemental declaration.  Okay.

2  Go ahead.

3      MR. THOMAS:  That this common test will allow a common

4  body of data that will, quote, show how the heat experienced

5  by the rider varies across the configurations, period,

6  unquote.

7      Now, if their theory is not air-cooling per se is

8  defective, but that their theory is that all of these

9  motorcycles can generate excessive heat, what Darnell has just

10  told us is that until we do all of the testing, we're not

11  going to know whether or not they generate excessive heat.  So

12  there is no dispute that there are variations, as our expert

13  shows.  And Darnell concedes that the results he got from his

14  limited testing of one -- basically one 2007 Touring

15  motorcycle cannot be extrapolated to the rest of the

16  population; that those results cannot be extrapolated to all

17  130-plus configurations.

18      THE COURT:  But the issue in these certification

19  motions is are the allegations susceptible to proof by

20  generalized evidence?

21      MR. THOMAS:  Right.  And --

22      THE COURT:  Mr. Kershaw's argument on behalf of the

23  plaintiffs is that, of course, you have -- just as defendants

24  did, you have an expert, which is not Mr. Darnell, but someone

25  else come in and test.  And there are generally accepted tests

1  that would involve attaching sensors or monitors to

2  individuals' legs.  And so, you know, his answer is, of

3  course, I can and will attempt to prove this defect simply by

4  those tests.

5         MR. THOMAS:  But that --

6         THE COURT:  Why isn't that a proper response to your

7  point?

8         MR. THOMAS:  Because it's directly contrary to the

9  Supreme Court's decision in Wal-Mart, where the court in

10  Wal-Mart said the question is not -- for a question to be

11  common -- there's lots of common questions.  The issue really

12  is whether or not the methodology used can generate common

13  answers.

14         There's no -- there's no claim here that the test

15  methodology that Harley-Davidson used, that they admit is

16  reliable, will generate common answers.  In fact,

17  Harley-Davidson's testing shows that it generates different

18  answers for different motorcycles under different

19  circumstances.

20         To say that the existence of a common test for

21  excessive heat is sufficient to create a common issue is like

22  saying, well, there's a common issue to measure the weight of

23  people, we just put them on a scale and measure them;

24  therefore, it's a common issue whether everybody in the United

25  States is excessively heavy.

1      It clearly is not a common issue.  It's clearly --

2  what they're trying to do in effect is create sub-classes for

3  each of the 130 different configurations even though there is

4  no -- there is no class representative -- just like there's no

5  class representatives for the 88s, the 110s or the 103s,

6  there's no class representative for the Touring family.

7  There's no class representative for the Dyna family.  There's

8  a representative for the 2009 Softail FLSTSB.  There's no

9  representative for the 2006 Softail, 2007 Softail, 2008

10  Softail, 2010, et cetera.

11      So what they're trying to do is saying, yes, we can

12  prove individually that each of these motorcycles are

13  defective by running your common test, but they have no class

14  representative for any of those.

15      THE COURT:  Again, the response to that is they all

16  have the same designed air-cooling system.

17      MR. THOMAS:  No, they don't.  Because they all have --

18  they all -- they are all air-cooled --

19      THE COURT:  Right.

20      MR. THOMAS:  -- just like all liquid-cooled

21  motorcycles are liquid-cooled.

22      THE COURT:  But the design you're saying is different.

23      MR. THOMAS:  The design -- the cooling system is

24  different.  Some of them have farings.  Some of them have

25  exhaust shields in different places, they have different

1   locations.  They have different -- some of them have the

2   engine idle management system from July 25 and forward.  Some

3   of them have the engine idle management system from July 25,

4   2007 and earlier.

5        There is different -- Tom McGowan's -- Thomas

6   McGowan's declaration lists there's different farings; there's

7   different saddle bags; different engine metals, some of which

8   reflect heat more than others; different seat locations;

9   different footrests; different calibrations.  Some of the

10  vehicles can be ridden with passengers.  Some can be ridden

11  solo.  Anything that affects -- because the vehicles --

12  because the engines are air-cooled, anything that affects the

13  flow of air over the engine affects the heat that reaches the

14  rider.

15       And so to say that the cooling system on these

16  vehicles is the same is just simply wrong.  They all have

17  different cooling systems, which Darnell has in effect

18  conceded when he has conceded that he has no evidence that the

19  common -- that the fact that all of these have the same V-Twin

20  Cam engines, he cannot say that they are all defective simply

21  for that reason.  He would have to do this individual test for

22  each one.

23       And there's a case actually that I didn't cite in my

24  brief because they raised this particular point for the first

25  time in their reply brief.  It's in re Bronco II, a decision

1    from the Eastern District of Louisiana, 177 F.R.D. 360, where

2    the plaintiff did exactly the same thing.  That was a case

3    involving alleged rollover issues with the Bronco II.

4         And the defendant in that case, Ford Motor Company,

5    pointed out that there were a number of different designs,

6    different configurations just like we have here.  And in

7    response, the plaintiffs did exactly what the plaintiffs are

8    doing here.  They said, well, that may be true there are all

9    these different configurations, but we have a test, and we can

10   test all of these different configurations to determine

11   whether or not each one of them is defective.

12        And what the court there said was, quote:  There is no

13   data that can possibly purport to have tested every

14   configuration, and to even suggest implementation of such a

15   process alone belies the concept of class-wide as opposed to

16   individualized proof.

17        THE COURT:  Mr. Kershaw, you want to respond to that

18   point?

19        MR. KERSHAW:  Yes, Your Honor.

20        First of all, let me say it's interesting that

21   Harley-Davidson's own pre-litigation testing tested three or

22   four bikes, and its for-litigation testing tested roughly

23   seven bikes.  And they are essentially concluding from seven

24   bikes that the air-cooled V-Twin design produces temperatures

25   that range roughly between, you know, a hundred and four or

1    five degrees up to 111 degrees.  Those are -- those are

2    applied across all of these class motorcycles.

3            And, Your Honor, I prepared a -- and the Court may or

4    may not want it, but I prepared a small binder to assist in,

5    you know, focusing the -- or providing the Court with the

6    information that I was going to go through in my argument.

7    Could I provide this to -- no, you don't want it?  Okay.

8            THE COURT:  It's not that I don't want it.  It's not

9    going to do me any good at this point.  You should have given

10   it to me a week ago.

11           MR. KERSHAW:  Well, Your Honor --

12           THE COURT:  I know, you only prepared for your

13   argument last night, but it really --

14           MR. KERSHAW:  No.  Actually -- okay.

15           THE COURT:  It doesn't help me at this point.

16           MR. KERSHAW:  All right.

17           THE COURT:  I mean, I have spent four days looking

18   through everything you have submitted, and so --

19           MR. KERSHAW:  Okay.  Well, there was such a pile of

20   evidence.

21           What I was going to say, Your Honor --

22           THE COURT:  And if it's in the briefs, you don't need

23   to repeat it.

24           MR. KERSHAW:  It's actually in the engineering

25   reports.  And let me just say, this point about Darnell said

1    nothing in his declaration about the availability of a

2    methodology to determine the heat experienced by riders, this

3    is simply a new argument.  It is -- and this is from

4    defendants' Daubert reply brief.  It is also contrary to the

5    Supreme Court's decision in Wal-Mart versus Dukes, which

6    establishes that what matters to class certification is not

7    the raising of common issues even in droves, but rather the

8    capacity of a class-wide proceeding to generate common answers

9    with respect to each class member.

10            And this methodology, the capacity -- this is what the

11    core issue is here, the class, not my capacity to establish

12    common evidence and in Costco's words, significant proof --

13            THE COURT:  Right.

14            MR. KERSHAW:  -- that there is a methodology at the

15    class certification stage that can establish the ultimate

16    issue in the case.  Is there a reasonable methodology to do

17    that?

18            And Harley-Davidson in its engineering reports, one

19    dated June 24th, 2003 -- you know, this is where they start.

20    And these are exactly what this is, this is the methodology.

21    They're developing a methodology here to do that.

22            Engine heat has been known to irritate the rider.

23    Purpose, to develop an accurate and consistent method of

24    measuring rider leg temperature during operation of a

25    motorcycle.  Conclusions, the data indicates that the test

1  method and fixture aid in reducing the amount of variables in

2  the procedure; variables are controlled, and the data is very

3  consistent.

4       And what it shows is this test procedure, where they

5  ride for 45 minutes at 80 miles an hour, then they go down to

6  parade duty, and then they go down to idle soak, which is

7  neutral.  And in the test -- so what you see here is -- and

8  it's a little hard to figure out what all this means.  The

9  bottom axis on this chart, and I'm sure Your Honor has seen

10  it, those are seconds.  So 45 minutes is 2,700 seconds.  So

11  what you do is you, you know, take a line and you draw it up,

12  and you look at the in-cell testing.  Well, that gets you to

13  temperatures, Your Honor, ranging from just -- at 80 miles an

14  hour from about 90 degrees up to over 120.

15       THE COURT:  On which motorcycle?

16       MR. KERSHAW:  Well, the one that they're using here,

17  the one that is supposed to be representative is one of the

18  V-Twin --

19       THE COURT:  But you've got four different engines --

20  well, two different engines right now and 130 different

21  configurations of that engine.  The issue -- I don't want to

22  get into the merits, or the lack thereof, of the results.

23       You spent a lot of time, which is interesting to me,

24  in the reply brief on a merits issue, whether their data is,

25  you know, accurate or not.  The question, as you well know, is

1    is that, you know, test so common that it can be applied

2    across, you know, all 130 different configurations?  Can you

3    eliminate the variables?  And your argument is, yes, you can.

4    But it's interesting you're using their experts to prove that.

5            Assume there were no experts, no testing done by

6    Harley-Davidson.  The real question is how would you prove

7    that?

8            MR. KERSHAW:  Your Honor --

9            THE COURT:  Or the real question is where is your

10   evidence that there is a common test, that the issue that

11   you've raised is susceptible to proof by generalized evidence,

12   that you could apply a test like that across all 130 different

13   models or configurations of this engine?

14           And frankly in looking at what you've supplied so

15   far -- I think it was supposed to be Mr. Darnell -- you don't

16   have that expert.  And so that's the question.  How can you

17   convince me that you really could do this?

18           MR. KERSHAW:  Your Honor, in great part because of

19   the -- and this rigorous analysis, that of course Wal-Mart

20   mandates, applies not only, as you well know, to the common

21   contention that the Court is supposed to review, but it

22   applies to the nature of the expert testimony.  And in this

23   case that's very significant because -- and, for instance,

24   defendants rely heavily on American Honda and Bruce.

25           THE COURT:  Let's focus on you.  Let's focus on --

1          MR. KERSHAW:  Well, I'm going -- that's -- okay.

2          THE COURT:  I guess to put it simply, who's your

3     expert?

4          MR. KERSHAW:  Well, Your Honor, I don't --

5          THE COURT:  You withdraw all these --

6          MR. KERSHAW:  We don't need an expert.

7          THE COURT:  -- conclusions -- you don't need an

8     expert?

9          MR. KERSHAW:  We do not need an expert on the ultimate

10    issue here.  What we have to show you and satisfy you is that

11    there is a common methodology --

12         THE COURT:  Right.

13         MR. KERSHAW:  -- that has the capacity to do what I'm

14    suggesting.  And nobody has done it on 130 --

15         THE COURT:  Who's your expert that says there is a

16    common methodology?

17         MR. KERSHAW:  Dr. Darnell reviewed the methodology

18    that Harley-Davidson employed.  And that methodology, which is

19    part of which I was starting to review with the Court, is just

20    that.  That is --

21         THE COURT:  Point me to a paragraph in his

22    declaration, in his deposition where he says in effect there

23    is a common methodology.

24         MR. KERSHAW:  Your Honor, he -- okay.  There isn't a,

25    there is not a paragraph that says there is a common

1   methodology.  What there is is a description of the

2   methodology.  He reviews the testing that was done by

3   Harley-Davidson itself.  The engineering reports, there's four

4   of them.

5           THE COURT:  Don't you think you need that, though?

6           MR. KERSHAW:  Well, Your Honor, let me -- look, let me

7   back up.

8           And to be perfectly frank with the Court here, you

9   know, our enthusiasm frankly for the merits of our case kind

10  of sucked us in on battling for the heart and mind of our

11  audience, which of course is you, rather than, you know,

12  maintaining the proper focus here, which was focusing on the

13  class proponents' capacity to establish that there's a common

14  methodology to test these things with generalized proof.  So

15  we opened with this merits related declaration, and frankly we

16  shouldn't have.

17          But with respect to this issue, the issue of heat, you

18  know, how much -- you know, in terms of the subject matter,

19  the rigorous analysis, what temperature does skin burn at?

20  Well, that's been studied extensively.  It's a well-studied

21  area.  It's within the ken of laymen.  Laymen kind of, you

22  know, understand what it burns at.  And what heat is

23  excessive?  Well, what heat is excessive is also well-studied.

24  There's no dispute in the scientific community with respect to

25  the fact that it's roughly 111 degrees that you feel pain and

1   you start experiencing first degree burns.  You get up to 130

2   degrees, and you're in the range of first degree burns; 131 to

3   140 is second degree; and above 140 is third degree.

4          And that's what their testing showed here.  And that

5   isn't a subject matter that is -- that requires the kind of

6   expert testimony that -- you know, in American Honda and

7   Bruce, you have this wobbling oscillation, et cetera, et

8   cetera, you know, standard, and nobody has studied that.

9   That's not within the common ken of the average person, and

10  there isn't a standard.

11         But there's clearly standards which enable us to look

12  at is this heat excessive, and does it pose an unreasonable

13  risk if you're experiencing it when you're driving down the

14  highway?  And I would submit -- and I had this whole argument

15  prepared.  But, in any event that, yes, that is material, it's

16  significant.

17         And probably the most troubling thing about this case

18  and that distinguishes this case from any other case frankly

19  that I've seen is that Harley-Davidson knows this issue.

20  They've tested for it.  They have an EITMS system that they've

21  installed on these bikes, and whether it works or not is

22  another issue.  But the point here is, knowing this, they

23  market, and there is -- and it's called a Super Tuner, a

24  Harley-Davidson Super Tuner.  There's lots of these on the

25  market.  But they market this to alter the air/fuel mixture.

 1          And, in fact, if you -- and this is demonstrative,

 2     Your Honor, of the evidence with respect to Richard Wiens

 3     because he had this installed on his bike after he suffered

 4     second degree burns on his way to Texas.  But the Super Tuner,

 5     which was recommended by Harley-Davidson to Mr. Weyuker and

 6     appears in his invoice.  Basically its customer states the

 7     rear cylinder has burnt his pant leg.  And so the tech looks

 8     at it and says that the rear cylinder is running 20 degrees

 9     hotter, and the bike needs a race tuner.  And the

10     recommendations were a Super Tuner, get a Super Tuner.

11          And so what happens is that's recommended.  He doesn't

12     do it because he doesn't want to pay a thousand dollars.  But

13     on the Super Tuner, it says:  Caution, Harley-Davidson

14     motorcycles equipped with some Screamin' Eagle performance

15     products may not be used on public roads and may be restricted

16     to closed course competition use.  This product is not legal

17     for sale or use in California on pollution-controlled

18     vehicles.  Screamin' Eagle performance products are intended

19     for the experienced rider only.  This product is intended for

20     race applications only.  Installation and warranty

21     implications, installation of this product and similar

22     products from other manufacturers may reduce or void your

23     Harley-Davidson vehicle warranty.

24          I haven't done the discovery to find out how many

25     thousands of these are being sold in California, but the

1   upshot of what this case presents to the Court is it's kind of

2   an issue on materiality.  And that is whether or not a company

3   that markets a product that it knows is going to be

4   modified -- and the vast majority of these modifications we

5   believe are with respect to the heat issues.  But what happens

6   when they're modified as to the heat issue?  They're taken out

7   of compliance with California and EPA emissions standards.

8           And so what you have on the street going on is these

9   bikes get purchased, there's not complaints because you

10  have -- they are being taken -- it's a pretty easy fix in that

11  sense, but the fix takes it out of compliance with emissions

12  standards and makes it illegal to buy or sell.

13          THE COURT:  Wouldn't there be evidence of that if you

14  really believe that?

15          MR. KERSHAW:  I haven't done the discovery yet, Your

16  Honor.  And the fact is --

17          THE COURT:  Even if you haven't done the discovery,

18  wouldn't you at least have some evidence?  I mean, that's pure

19  speculation what you're arguing to me right now.  It's

20  basically saying --

21          MR. KERSHAW:  Your Honor -- go ahead.

22          THE COURT:  Right?  I mean, there's no evidence before

23  me that supports that argument.

24          MR. KERSHAW:  Well, there is.

25          THE COURT:  It's what you believe.

1          MR. KERSHAW:  No, there is evidence before you.

2          THE COURT:  That people are --

3          MR. KERSHAW:  Dr. Darnell --

4          THE COURT:  -- that they're selling a motorcycle that

5     you know is going to be modified and that will take it out of

6     compliance with California emissions standards.  That's what

7     you just said to me.

8          MR. KERSHAW:  And there's also --

9          THE COURT:  There's nobody that -- there's no evidence

10    of that.

11         MR. KERSHAW:  Dr. Darnell specifically identified the

12    cottage industry which exists with respect to this issue, Your

13    Honor.

14         THE COURT:  That's pure speculation.  I mean, where is

15    a government report?  I mean, there are government agencies

16    that are supposed to --

17         MR. KERSHAW:  You're right.

18         THE COURT:  Okay.  So where is the evidence of that?

19         MR. KERSHAW:  And I have -- I do have information, but

20    it's not before the Court, so I'm not going to go into it.

21         But the answer to this -- we are allowed to argue the

22    inferences here.  I mean, the crux issue here is do I have the

23    capacity with a common methodology to establish that these

24    bikes are excessively hot?  Skin can be tested.  There's --

25    we've shown you that there's methodologies that can do that

1    clearly.

2            THE COURT:  Yeah, but you also have to have -- part of

3    your case is that Harley-Davidson has knowledge of this

4    and are violating California statutes by omitting this

5    information when they sell these motorcycles to the consumer.

6    In effect your argument is this information about excessive

7    heat needs to be -- it's material, and it needs to be given to

8    the consumer so the consumer can make a decision as to whether

9    or not to purchase this motorcycle.  That's your argument.

10           And so if you focus on Harley-Davidson's knowledge,

11   I've got from you -- at least you've gotten some documents

12   from the company involving a test done in two thousand and --

13   let's see -- three, a report dated June 2003, in which the

14   conclusion is that engine heat has been known to irritate the

15   rider.  And then you've got a test in 2005, an engineering

16   report that says that rider comfort has become one of the

17   highest complaints.  And then you have the other document

18   which also you mentioned just recently, other document from

19   Harley-Davidson.

20           Let me play devil's advocate for a second.

21           MR. KERSHAW:  Okay.

22           THE COURT:  The argument is you're attempting to bring

23   almost 40,000 people into a class, 40,000 people who have

24   purchased either the 88 or the 96 cubic inch V-Twin Cam

25   engine, one of the models -- and I think the number is around

1   44,000 -- and that there is this defect common to all of those

2   motorcycles.

3          And there isn't a lot of discussion of this in the

4   briefs, at least from your point of view.  Obviously

5   Harley-Davidson raises it, and it comes up in all these class

6   certification motions, and that is the lack of evidence of

7   complaints, lawsuits or internal reports.

8          Those are the three things that everyone says

9   obviously proves knowledge, that the company received

10  complaints; the company was sued; or the company did its own

11  internal testing and generated a report which clearly shows

12  either circumstantially or directly that the company had

13  knowledge, that they were aware of this defect, and they

14  decided to put it out and market it anyway.  That's the

15  allegation from plaintiffs.  I don't see any of that in this

16  case.

17         I've got obviously a complaint from your client and a

18  complaint from Mr. Weins.  The data from Harley-Davidson,

19  who's been in business for over a hundred years, shows almost

20  no complaints about excessive heat.  And I know your response

21  to that is, well, that's because people are modifying their

22  motorcycles, so of course they don't have any complaints.

23         Why isn't that significant in and of itself, that this

24  really is an individual claim by the proposed class rep or by

25  Mr. Weins, that you can't suddenly bring in 44,000 members to

1    say that we were sold a defective product because there's no

2    evidence?  It's sort of the question that is always raised in

3    these cases, and it goes to obviously the merits somewhat.

4    But because of Wal-Mart versus Dukes, federal courts are in

5    effect considering merits issues since they overlap with class

6    cert.  But where is the evidence of the defect other than your

7    client and Mr. Weins?

8            MR. KERSHAW:  Your Honor, I obviously didn't do a

9    particularly good job in convincing the Court that there is

10   extensive evidence with respect to Harley-Davidson's knowledge

11   on its own testing.  The testing that it has done establishes

12   temperatures that are well -- that basically routinely show

13   that second and third degree burns occur at that level.

14   That's knowledge.

15           THE COURT:  Where is the evidence of it?

16           MR. KERSHAW:  The evidence is in the reports that we

17   just went through.  Here's another one.  This is a -- it's

18   called a TIR, which is a test incident report.

19           THE COURT:  Right.

20           MR. KERSHAW:  Warren Nord on June 9th, 2007, with

21   respect to a 2008 class motorcycle, says -- and he's employed

22   by Harley to check out these incidents:

23           This rider experienced excessive heat emanating from

24   the engine.  The rider first experienced the heat at city

25   traffic conditions 60 miles into the shift while in Georgia on

1   an FL-2.  Heat was felt on both inner thighs at traffic

2   lights.  The ambient temperature was in the mid '90s when

3   returning on the interstate at 75 to 79.

4          The right side, however, was excessive, and the rider

5   could not keep his gloved hand in the area for very long.

6   Remember, this is at highway speeds with what should have been

7   sufficient air flow.  And I'm skipping down.

8          As two General 5's were ridden to complete the shift,

9   which includes rural and city traffic, the heat was causing

10  the rider to move his legs wherever to try and not expose his

11  calves to any more heat.  The whole issue is is it safe?  The

12  only reason the rider continued to ride this vehicle was that

13  he was being paid to do it.  If this was the rider's personal

14  bike, he would have parked it.

15         And this isn't the only -- there's a whole -- there's

16  a number of these TIRs that are like this.  This is common

17  evidence, Your Honor.  This, along with the engineering

18  reports, show that not only do we have the capacity to show --

19         THE COURT:  I'm sorry to interrupt you, but --

20         MR. KERSHAW:  Okay.

21         THE COURT:  -- when I hear you say things such as

22  there are a number of TIRs that say the same thing, where are

23  they?  I've got one.

24         MR. KERSHAW:  Well, no, Your Honor, here's another

25  one.  And that is a test incident report, again by Warren

 1   Nord, dated 4/26/2006.  The excessive engine heat -- and let

 2   me just skip down here.  I'm not going to read all this.

 3         Okay.  Investigated, known issue with big twin is the

 4   heat at idle.  Large displacement engine runs slightly hotter

 5   than TC-88.

 6         THE COURT:  Maybe my question isn't clear enough.

 7   What are you reading from?

 8         MR. KERSHAW:  A TIR that's in front of you.

 9         THE COURT:  In front of me?

10         MR. KERSHAW:  Yes.

11         THE COURT:  From whom?

12         MR. KERSHAW:  I beg your pardon?

13         THE COURT:  From whom?  Which exhibit?

14         MR. KERSHAW:  It is -- it's based on Harley Johnson

15   003676 filed under seal as Exhibit 9 to the declaration of

16   William A. Kershaw in support of our motion for class

17   certification.

18         THE COURT:  Okay.

19         So this is an event from May of 2007, right?

20         MR. KERSHAW:  I think it's April 2006, Your Honor.

21         THE COURT:  Which one are you looking at?

22         MR. KERSHAW:  Well, you're apparently -- you may be

23   looking at -- yeah, you're looking at the one I just read,

24   correct.  Okay.

25         THE COURT:  Okay.

1          MR. KERSHAW:  And --

2          THE COURT:  Which involves which motorcycle?

3          MR. KERSHAW:  This involved a 2008 FLHTCU.

4          THE COURT:  With which size cubic inch V-Twin Cam

5      engine?

6          MR. KERSHAW:  I -- from the face of this document,

7      Your Honor, first of all, that model is -- it's a Touring

8      model, and I'm pretty sure it's either -- it's a 96 or above.

9          THE COURT:  You see the problem?  Just by my asking

10     those questions, the issue then becomes which model is it?

11     What's the engine size?  Were there modifications to the

12     motorcycle?  It's all the questions raised that the defendants

13     say require individualized proof that would cut against

14     certifying this class.

15         Just because someone does a test on a model in 2007,

16     you want then -- well, I don't want to get to the merits, but

17     in effect that then is common proof of a defect across the

18     board of all these motorcycles.  And that's the problem I'm

19     having in terms of the leap that you want.

20         There are perhaps documents that may be amenable to

21     generalized proof.  Ladies and Gentlemen, here are 15 TIRs

22     that show that in these 15 tests there was excessive heat.

23     But you want to make the jump from that to, therefore, there's

24     a defect.  And even if you don't ask that second question,

25     going back to the first question, you know, is this enough

 1    generalized evidence or is this issue susceptible to proof by

 2    generalized evidence?  The defendants are going to say no, for

 3    the reasons that you just said, Judge, and that is you just

 4    asked five different questions about that one motorcycle and

 5    that one test.

 6         That's the problem I'm having with should I certify

 7    this -- one of the problems I'm having with should I certify

 8    this as a class action or not.

 9         MR. KERSHAW:  Your Honor, if --

10         THE COURT:  It would help obviously if you had a

11    history of motorcycles failing, if you had personal injury

12    lawsuits, if you had complaints.  I don't see that in this

13    case.  And so, you know, it comes back to is Mr. Weyuker's

14    experience with this motorcycle unique?  And Harley-Davidson

15    is suggesting, yes, it's so unique that you can't then

16    generalize it across 44,000 people, especially 99.9 percent of

17    those who have had no problems with their motorcycle.

18         How do I get around that?

19         MR. KERSHAW:  Let's suppose, Your Honor, that it's

20    true that the reason that you're not seeing a lot of

21    complaints -- and there are complaints, but that you're not

22    seeing the kind of numbers that -- and I'm not sure what that

23    is that would satisfy the Court -- is because these

24    motorcycles are being modified to deal with the heat issue.

25         There isn't any question --

1              THE COURT:  I know you keep saying that, you keep

2       coming back to that, but I don't have any evidence of that, I

3       just don't, in front of me.

4              MR. KERSHAW:  Well, Your Honor, that's not -- first of

5       all, at the certification stage, we are required to establish

6       that there is a -- obviously we have the capacity to show you

7       that common evidence can establish our common class

8       contention.

9              THE COURT:  Right.

10             MR. KERSHAW:  I think these tests do that.  We haven't

11      done all of the discovery here.  If I am able to go out and

12      start doing discovery on a number of Super Tuners that

13      Harley-Davidson sold, how many people really raced these

14      motorcycles -- it's a 109 year old design -- and what is the

15      reason they really do this --

16             THE COURT:  Why haven't you?  I know that there was an

17      agreement not to do merits discovery, but if you anticipated

18      this would be such a significant issue at the class

19      certification stage, why didn't you ask for this type of data?

20             MR. KERSHAW:  Your Honor, I believed that the testing

21      done by Harley-Davidson and the nature of it showed exactly

22      what we have to establish under Wal-Mart, under Falcon, under

23      all of those cases.  Because it establishes that we do have

24      the capacity to provide a methodological solution to answer

25      the common contentions in this case.

1          The full discovery that gets done here will certainly

2     include the things that we have been talking about.  But at

3     this stage of the proceedings, you know --

4          THE COURT:  I know we're going in circles, but I keep

5     coming back to I don't feel comfortable making a finding that

6     there is, you know, that common testing method absent somebody

7     on your side telling me that.  And, again, I don't see --

8     you're right that, you know, Mr. Darnell doesn't say that

9     specifically.

10          MR. KERSHAW:  He does in paragraph 18.

11          THE COURT:  Go ahead.  In where?

12          MR. KERSHAW:  He does in his surreply -- or in his

13     surr-declaration.

14          THE COURT:  Hang on.  Let me get that.  Where was that

15     attached to?

16          MR. KERSHAW:  It was our reply to opposition to class

17     certification.

18          THE COURT:  Grab that for me, if you would.

19          MR. KERSHAW:  Your Honor, you know what, my colleague

20     just told me that it's attached to my declaration --

21          THE COURT:  Okay.

22          MR. KERSHAW:  -- with respect to -- in support of our

23     opposition to the motion for summary judgment.

24          THE COURT:  What exhibit?

25          MR. KERSHAW:  It is --

1          THE COURT:  There it is, I got it.

2          You said 14?

3          MR. KERSHAW:  Yes.

4          THE COURT:  Okay.  And so --

5          MR. KERSHAW:  Paragraph 18 --

6          THE COURT:  All right.

7          MR. KERSHAW:  -- page 4.

8          THE COURT:  Okay.  It is my opinion that the testing

9    methodology, as described by Mr. Wagner-Jauregg in his report,

10   represents a reliable methodology that is capable of producing

11   reliable results on the amount of heat experienced by riders.

12   I confirmed the reliability of his testing methodology, but

13   not his reported results, by performing tests using a

14   methodology similar to his on a smaller sample of motorcycles.

15          MR. KERSHAW:  And then 19 and 20 also addresses the

16   issue.

17          THE COURT:  All right.  And, Mr. Thomas, your response

18   to those three paragraphs is what?

19          MR. THOMAS:  That yes, of course the testing

20   methodology that Harley used was reliable.  That's why we

21   presented it to the Court.  The question under Wal-Mart is not

22   whether there's a common methodology, but whether the common

23   methodology is capable of yielding a common answer across the

24   entire class of motorcycles.

25          And, again, the analogy to --

1      THE COURT:  He says that in paragraph 18.

2      MR. THOMAS:  No, he doesn't.  He says --

3      THE COURT:  He says it's reliable and is capable of

4  producing reliable results.

5      MR. THOMAS:  Right.  And so you can test the 2009

6  Softail Cross Bones, like Mr. Weyuker, which Mr. Darnell

7  decided not to do.  You can test --

8      THE COURT REPORTER:  Slow down, please.

9      MR. THOMAS:  I'm sorry.

10      You can test a 2009 Softail Cross Bones, like we did,

11  and show what the results are.  And you can test a 2007 Cross

12  Bones, you can test a 2012 Dyna, you can test a 2007 Ultra

13  Glide, and you can get reliable results as to each of those

14  motorcycles.  But our testing shows they're going to be

15  different results.  They do not yield a common answer.

16      What they want to do, what they're really saying is we

17  want to have 130-plus separate trials because we want to test

18  130-plus different vehicles, even though we don't have a

19  representative for all of those 130 different configurations.

20  They essentially want you to create 130 different sub-classes

21  so their expert can run the test on each of the 130-plus

22  different configurations and come to an individual conclusion

23  as to each one of those.

24      This is exactly what the -- I encourage you to look at

25  the Bronco II decision I cited earlier, because that's exactly

1   what they do in Bronco II.

2           THE COURT:  Mr. Kershaw?

3           MR. KERSHAW:  Your Honor, I think it's fair to say

4   that this 130 mantra is not reasonable and is not fair,

5   because it's not what Harley-Davidson does itself, make the

6   determination as to issues like excessive heat with respect to

7   its big V-Twins.  You will pick a reasonable number, like

8   their experts did.  They picked seven.

9           They also have -- Your Honor, it's fairly difficult

10  for an individual to challenge in this fashion when the cost

11  of the kind of study that Harley-Davidson did -- I don't know

12  how much it cost, but it's way more than any individual could

13  sustain.  And so they picked seven motorcycles that were

14  representative of the V-Twin design, and they tested those.

15  And those results in terms of the heat produced by that

16  configuration is trans -- is common to all -- to that core

17  design feature.  The fact that there may be some things around

18  it is not fatal to class certification in any way given the

19  circumstances here.

20          THE COURT:  All right.  Let me shift gears away from

21  this.

22          Mr. Weyuker testified that he continued to use his

23  motorcycle even after he discovered the alleged defect.  His

24  pants had caught on fire.  He's ridden the motorcycle for, I

25  can't remember but I think it's either five or six thousand

1    miles.  He didn't take it in.  He didn't return it.  He -- I

2    don't know if he still has it.

3        MR. KERSHAW:  He took it in.  He took it in for sure

4    several times.

5        THE COURT:  Okay.  But he kept riding it, right?  He

6    did, right?

7        MR. KERSHAW:  Yes, he did.  He kept riding --

8        THE COURT:  Okay.  And the issue is, doesn't that

9    somehow undermine his claim or the claim by the class that --

10   and it goes to this materiality issue, that if Harley-Davidson

11   had included the safety warning that you want Harley-Davidson

12   to include, or you argue should have been included about

13   possible excessive heat -- you know, he says if I would have

14   known that, I wouldn't have purchased the product.  Tell me

15   why that isn't contradicted by the fact that he continued to

16   ride his Harley despite this alleged known defect?

17       MR. KERSHAW:  Your Honor, truly as a practical matter,

18   you're out there, you buy a $20,000 motorcycle or car or

19   anything like that, and it's got this issue, and so you -- you

20   know, we have clients, we have people who come to us that

21   have -- they put on steel calf guards and asbestos and things

22   to try to protect themselves.  So they try to figure out

23   workarounds with it, and they do take them back, and they're

24   told, hey, this is normal.  That's what Mr. Weyuker was told,

25   this is normal.  And -- but there's a fix, and the fix happens

1    to be -- yeah, it makes it illegal.  But there's a fix,

2    there's a number of ways to do it, and Harley-Davidson sells

3    one of them.  There's others on the market.  That's troubling

4    to me, Your Honor.  That is just not a reasonable response to

5    this situation.

6           And so you are somebody who is in this situation, they

7    keep riding it because they can't run out and buy another one,

8    and they won't take it back.  So this is what happens.  And I

9    don't think there's much more I can say to that, Your Honor.

10          THE COURT:  Does he still have it?

11          MR. KERSHAW:  Does he still have that motorcycle?

12   Yeah, he does because he modified it.  It's now, you know, not

13   emissions compliant, and he can ride it.

14          THE COURT:  One of the issues that's sort of -- and I

15   don't want to call it a throw-away issue, but it's raised,

16   maybe it's because of my page limitations.  But at the very

17   end of the opposition, and it's on the issue of is class

18   resolution superior to other available methods for the fair

19   and efficient adjudication of this controversy, they talk

20   about how motorcycles and motor vehicles are subject to the

21   jurisdiction of the National Highway Traffic Safety

22   Administration.

23          And they argue plaintiffs can petition NHTSA to

24   investigate alleged safety issues.  And if NHTSA finds the

25   motorcycles contain a defect related to motor vehicle safety,

1    it's required by law to order Harley-Davidson to recall the

2    motorcycles to fix the defect.  Several courts have recognized

3    that the administrative remedy available through the National

4    Highway Traffic Safety Administration is superior to class

5    action litigation, citing in re Bridgestone Firestone, Inc.

6    and in re Ford Motor Company.

7            You didn't respond to that specifically and, again, it

8    may be because of my ten-page limit in replies, but what's

9    your response to that argument?

10           MR. KERSHAW:  My response to that argument is, Your

11   Honor, that there is a body of information out there.  You

12   know, I can tell the Court what it is about this particular

13   issue, that is these race tuners and motorcycles being EPA

14   compliant and so on and so forth, but it's not before the

15   Court, and so that's my fault.

16           But, you know, if the Court wants me to answer that,

17   the fact is there's a hole, there was a hole and has been a

18   hole in the enforcement of those regulations by the officials

19   who are, you know, mandated to look at cars, to look at a lot

20   of things.  And there's a time issue, and I've got articles on

21   this, and I should have put an expert declaration in front of

22   you, Your Honor.

23           That's the answer to your question, and --

24           THE COURT:  Did your client --

25           MR. KERSHAW:  -- it doesn't work.

1          THE COURT:  Did your client report it?

2          MR. KERSHAW:  Did my client report it to the EPA?

3          THE COURT:  To the NHTSA or the EPA or anyone.

4          MR. KERSHAW:  I don't -- I don't know, but I don't

5     believe so.

6          THE COURT:  Why wouldn't that be a superior method to

7     resolving this issue as opposed to a class action lawsuit in

8     federal court?

9          MR. KERSHAW:  Your Honor, because honestly in that

10    circumstance, that organization with respect to this issue,

11    they've got bigger fish to fry, and that's what they do.  And

12    that's what --

13         THE COURT:  Bigger fish than a company that's been in

14    existence forever that you allege is selling this incredibly

15    dangerous motorcycle?  How could that not be a bigger fish?

16    That's the part --

17         MR. KERSHAW:  I asked the same question.

18         THE COURT:  Well, they have to know about it, though,

19    right?

20         MR. KERSHAW:  They being the EPA?

21         THE COURT:  And NHTSA.

22         MR. KERSHAW:  Your Honor, when I said bigger fish to

23    fry, I said that in a pejorative sense, and I don't mean that.

24    I guess my point is that they have obligations with respect to

25    the entire automotive industry.  This has been a very low-vis,

1   and there is a cottage industry out there, Your Honor.  And

2   part of the reason it flourishes is because the NH --

3          THE COURT:  The National Highway Traffic Safety

4   Administration.

5          MR. KERSHAW:  Because they don't pay attention to it,

6   Your Honor.  And, you know, you don't have anything in front

7   of you on this, but the Court asked me, and so I'm trying to

8   give you an answer.  There are articles on this.  I could read

9   one to you, but I won't do that.

10          THE COURT:  Okay.  It's ten to 12:00.  We're going to

11   take a break.  If you had -- well, you didn't have plane

12   flights, but if you have a plane flight, you might want to

13   cancel it.  Let's come back at 1:15, and I'll have a few more

14   questions, and then we'll resolve this issue.

15          I will take now your little binder, if you think it

16   would assist the Court.

17          MR. KERSHAW:  Certainly, Your Honor.

18          THE COURT:  Okay.  See you at 1:15.

19          MR. KERSHAW:  Yes, Your Honor.

20          (Lunch recess taken at 11:55 a.m.)

21                        ---o0o---

22

23

24

25

1          SACRAMENTO, CALIFORNIA

2        WEDNESDAY, MAY 2, 2012, 1:25 P.M.

3                  ---o0o---

4          THE COURT:  Okay.  In Mr. Darnell's second

5    declaration, Mr. Kershaw, he says that he did some limited

6    testing and that he duplicated the testing done under the same

7    protocol as described in the Wagner-Jauregg report.  And he

8    did it on the same model liquid-cooled motorcycle used in

9    Harley-Davidson's testing, a 2010 Kawasaki Voyager, and one of

10   the model Harley-Davidson motorcycles against which the

11   liquid-cooled Kawasaki was compared, a 2007 Harley-Davidson

12   Ultra Glide Classic with a 96 cubic inch engine.  And then he

13   talks about his results.

14         And then going back to paragraph 18, he says it's his

15   opinion that the methodology described by Wagner-Jauregg

16   represents a reliable methodology.  And that's your argument

17   obviously, that there is a basis for generalized proofs

18   acceptable -- or allegations susceptible to proof by

19   generalized evidence, that there is a reliable testing

20   methodology, and he says it's the one used by Wagner-Jauregg.

21         He says, I confirmed the reliability of this testing

22   methodology, but not his reported results.  And he confirmed

23   that by performing tests using a methodology similar to his on

24   a smaller sample of motorcycles.

25         And as I reread that during the lunch hour, I'm

1   thinking to myself, if that's the reliable methodology, that

2   that's what makes these allegations susceptible to common

3   proof, but you get completely different results from just

4   these two experts, how does that -- the first question I have

5   is, how can you conclude that that's a reliable methodology?

6          And I think he tries to answer that by saying, well,

7   it's a reliable methodology when I do it on a smaller sample

8   of motorcycles.  But, in my view, that doesn't help your

9   argument that there is this general test out there that we can

10  apply to prove the allegations in this case.  Because now he's

11  saying, well, it's reliable, but it's only reliable on a

12  smaller sample.  And your class doesn't involve a smaller

13  sample of motorcycles, it involves a pretty large sample of

14  motorcycles.

15         So, you know, in his declaration he says Wagner's

16  results make no sense, he was unable to duplicate the results,

17  he calls the results into question, but then he doesn't

18  question the reliability.  So that's sort of part one of the

19  questions I have for you.

20         How can you have a generalized reliable testing

21  methodology that your own expert then says, well, it's

22  reliable, but the results are completely different?  And he

23  doesn't try to explain that, he doesn't have to at this point,

24  in this phase of the motion, but it seems so inconsistent to

25  me.

1           MR. KERSHAW:  It's a two-part answer, Your Honor.

2           First, I think that the results -- that is truly going

3  to the merits here at this stage, and I think that's one thing

4  I was trying to avoid doing.

5           But secondly, with respect to the issue of the

6  reliability of the methodology, at page 25 he offers -- not

7  page 25 -- at paragraph 25, he offers further evidence as to

8  why this methodology would be reliable.  And he says, based on

9  a review of Harley-Davidson's parts -- this is at paragraph

10  25, line 16.  I'm going right to the heart of it.

11          Based on a review of Harley-Davidson parts manuals and

12  workshop manuals, I determined that the heat-producing

13  components in the cylinders -- this is for all 130 distinct

14  motorcycles -- included across putative class motorcycles are

15  identical.  Each of these parts are identified in

16  Harley-Davidson parts catalog between 2007 and 2011 by the

17  same part number, and then the number.  This information was

18  confirmed by discussions with an employee of Bartels, et

19  cetera, et cetera.

20          And so that goes to the issue of -- you know, your

21  question is, well, what evidence is there that these 130

22  configurations are the same?  And that's kind of at the heart

23  of it.  And the methodology, I mean Harley-Davidson's

24  methodology to test the heat issue came up with very

25  different, and I would say came up with results that are more

1    consistent with the real world.  We're talking about parade

2    duty where -- you know, stop and go traffic where that

3    vehicle, that cylinder is becoming extremely hot.  And

4    Harley-Davidson's come up with a range of literally five or

5    six degrees, all of them under 111, the pain threshold.  I

6    mean -- okay.

7          THE COURT:  You're not answering my question.  It's

8    much simpler than that.

9          He likes the methodology, but he doesn't like the

10   results.  And I don't understand how you can approve of the

11   methodology, because it's got to be a methodology that's

12   common and can be used by in effect both sides.  It sort of

13   goes back to the defendants' point, it's not so much the

14   question, it's is the answer susceptible to common proof.  And

15   so, in effect, your experts have to somewhat agree on the

16   methodology.

17         Now your expert seems to think that the methodology

18   used by Wagner is reliable, but then he puts this big caveat

19   and says but the results aren't reliable.  I don't understand

20   how you can have a reliable methodology and unreliable

21   results.  That doesn't make sense to me.

22         So then, as I said, in the next paragraph he sort of

23   backs off and he says, well, I did it on a smaller sample of

24   motorcycles.  And maybe that's true, maybe these tests are

25   reliable on a smaller sample.  But this case doesn't involve a

1      smaller sample.

2            And that would also suggest that maybe the test is

3      reliable on an individualized basis.  But you want a class

4      action, and you want to be able to prove that every member of

5      this class suffered similar or the same injuries.  You know,

6      damages will be determined ultimately, and we don't have to

7      worry about that.  But the gist of the class action is I can

8      prove this defect, and it will apply across the board, and

9      here's how I'm going to prove it, Judge.  I'm going to use

10     this test.

11           I don't know how you can do that.  At least I don't

12     see any evidence in front of me that I can rely on in finding

13     that there is this general, common basis of proving the case.

14     At least you don't have an expert that says that to me.  He

15     really has a caveat.

16           And then so the second part of this question was then

17     I read further into the declaration, and then he says, well,

18     maybe we can use what I call the pre-litigation testing.  He

19     says you can also use the TED device rather than a rider,

20     which was the method used by Harley-Davidson engineers

21     pre-litigation.  He says maybe that might be reliable, but he

22     hasn't done any of that type of testing.

23           So, again, part of the criticism obviously in the

24     motion to exclude Mr. Darnell's declarations is that it's not

25     opinions, it's pure speculation, he's just not someone who has

1    done the testing.  And you sort of solve that problem in the

2    second declaration by having him do some actual testing.  I

3    still am not -- it seems completely illogical to me for him to

4    sit here and say -- if he were sitting right here, I'd love to

5    know the answer to that question.  But how can you say that

6    the method is reliable but the results are unreliable?

7            MR. KERSHAW:  Your Honor, I think the Court is -- I

8    think the Court is merging the reliability issue, which is a

9    merits -- I mean, ultimately the results are a merits issue,

10   with is this methodology reliable?  Well, it's a methodology

11   that was used by Harley-Davidson.  It's a methodology that was

12   used -- that is, the thermocouple testing.  It was used by

13   Harley-Davidson post-litigation or for litigation.  And

14   obviously that methodology with thermocouples, whether it's

15   in-cell or on-track, is a methodology that neither party

16   disputes is a methodology to be used here.

17           And so the results of that methodology are kind of the

18   ultimate question, the merits.  And I think that, particularly

19   when you have evidence that the same piston and cylinder

20   number is used across all of these models, that you have the

21   basis to find that we have the capacity to have a methodology

22   that addresses the common contentions of the class.

23           THE COURT:  That's the issue, can it be applied across

24   a large cross-section of the different configurations to

25   generate a common body of data?

1           MR. KERSHAW:  And I respectfully submit that it can.

2           THE COURT:  Where's the proof of that?  Where's the

3    evidence that supports that?

4           MR. KERSHAW:  Well, the evidence that supports that --

5           THE COURT:  Other than sort of a conclusory opinion by

6    an expert that hasn't done any testing, I mean, that is really

7    subject to some real questioning in terms of being able to

8    support his opinions?

9           MR. KERSHAW:  Could I -- let me ask the Court to focus

10   on the parts for a second.

11          The parts across all 130 are the same, and so the

12   methodology to test the same parts across all 130 should be

13   consistent.  And the methodology offered by Harley-Davidson

14   and the methodology offered by Dr. Darnell and the methodology

15   done by Harley-Davidson pre-litigation are the same, and they

16   all agree.

17          THE COURT:  Then it should lead to the same result.

18          MR. KERSHAW:  But, Your Honor, that's the merits.

19          THE COURT:  Right?

20          MR. KERSHAW:  No, no.

21          THE COURT:  But, again, you know as well as I do that

22   courts at a class cert stage can still consider some merits

23   issues when the merits issues so intertwine with the class

24   cert issues that it has to be considered.  So that's sort of

25   the huge change that Wal-Mart and other cases have brought to

1    this.  And I just read a really interesting article on the

2    significant difference between class actions in state court

3    and class actions in federal court now, especially after

4    Brinker.

5         But federal courts are doing exactly what I'm doing.

6    The Supreme Court has given us a lot of discretion in this

7    area, and that seems to me to be such a fundamental issue on

8    this class cert question.  You know, it just seems completely

9    inconsistent to me to have what you say is a reliable test.

10   If the test is so reliable, then the results should be

11   reliable.  And your guy is saying, no, the results aren't

12   reliable.

13        MR. KERSHAW:  And I think under Costco, Your Honor,

14   the court --

15        THE COURT:  And your guy has honestly less experience

16   and less credentials on this reliability and testing issue, he

17   just does, compared to the defendants' experts.

18        MR. KERSHAW:  I --

19        THE COURT:  That's not sort of his area of expertise.

20   He's a guy that loves motorcycles, he knows everything about

21   motorcycles, and his life is motorcycles.  But, in terms of

22   the specific issues involved in this case, it may be one of

23   the reasons why -- you know, other than you didn't want to get

24   into merits questions, and so you withdrew that portion of his

25   declarations.  All of the criticisms in the motion that was

1  brought to exclude his entire testimony are valid criticisms

2  of his declaration.

3      MR. KERSHAW:  Well, Your Honor, the criticisms -- the

4  criticisms they're making of the methodology is the

5  methodology Honda used.  And the results, when the Court is

6  talking about, you know, the results as informing lack of

7  reliability, I think in Costco that's exactly what the court

8  was saying.

9      It was saying -- Costco seems to equate the rigorous

10  analysis with an in-depth examination of the underlying

11  merits, and the court said that's not right.

12      And I think that when you were using the results to

13  inform the methodology or the reliance there, or reliability,

14  that's the merits.  That's what's in issue here.  And is the

15  methodology itself sufficiently reliable to be presented?  And

16  both sides are using the same methodology, Your Honor.

17      THE COURT:  You're talking about Ellis versus Costco

18  Wholesale Corporation?

19      MR. KERSHAW:  I am, at page -- of course, these page

20  numbers are always so fun to find -- 983, I believe.

21      And they say this is incorrect, what I was just

22  talking about.  The district court is required to examine the

23  merits of the underlying claim in this context only inasmuch

24  as it must determine whether common questions exist, not to

25  determine whether class members could actually prevail on the

1    merits of their claims.

2         THE COURT:  Right.  That's exactly what I'm doing

3    here, I'm trying to find if common questions exist.  But to do

4    that -- and I don't want to argue with you, but --

5         MR. KERSHAW:  Sure.

6         THE COURT:  I don't know if you had a chance to look

7    at the Ford Bronco case over the lunch hour.  I don't know if

8    you want to comment on that.

9         MR. KERSHAW:  May I have a moment, Your Honor?

10        THE COURT:  You may.

11        (Plaintiffs' counsel conferring.)

12        MR. KERSHAW:  Your Honor, I think -- you know, of

13   course, it was in 1997.  It didn't address the CLRA, it didn't

14   address the UCL, and that's what we are proceeding under here.

15   You know, it was common law fraud that they were talking about

16   there, and these are different critters.

17        And the nature of the defect was different, Your

18   Honor.  The nature of the subject matter here is subject

19   matter that is within a layperson's experience and, you know,

20   relates to a clearly established body of scientific knowledge

21   that there's not a lot of dispute about.

22        THE COURT:  The plaintiffs' expert opined generally

23   that all Bronco II vehicles have an unreasonable propensity to

24   roll over in extreme, but reasonable and foreseeable

25   maneuvers.  He based his conclusion on the stability index of

1    the Ford Bronco II as well as on performance testing with a

2    number of Bronco II configurations with a variety of options

3    and with several model years.  He admitted that neither the

4    testing he witnessed nor the data he reviewed has encompassed

5    every possible variation of Ford Bronco II that might affect

6    the vehicle's stability, but nevertheless finds that all

7    Bronco IIs are unreasonably susceptible to roll over.

8         Defendants argued that the stability index is not an

9    accurate common measure because, contrary to plaintiffs'

10   assertions, all Bronco II vehicles are not substantially the

11   same.  They also submitted evidence that the static stability

12   index is not an accurate predictor of the vehicle's rollover

13   propensity.  And they submitted evidence that after-market

14   modification and differences in vehicle maintenance and use by

15   individual consumers as well as environmental factors can

16   affect the handling and stability characteristics of the

17   vehicle.

18        And the court concludes that plaintiffs' expert

19   proposes the use of a very specific type of test at a specific

20   speed under specific conditions, a test that admittedly does

21   not take into consideration numerous factors that might affect

22   the vehicle's propensity to roll over.  Moreover, there's no

23   data that possibly can purport to have tested every

24   configuration.  And to even suggest implementation of such a

25   process alone belies the concept of class-wide as opposed to

1    individualized proof.  The court, therefore, found the

2    proposed method of common proof unsatisfactory.

3         The court also found that another problem created by

4    plaintiffs' reliance on performance testing data is a fact

5    that a review of accident statistics for various model years

6    of Bronco IIs and pure utility vehicles suggest that

7    performance by Bronco IIs for a range of model years is

8    comparable to that of its peers.  If plaintiffs proposed to

9    condemn Bronco IIs but not other sport utility vehicles, and

10   if plaintiffs proposed a condemn all Bronco IIs as a class,

11   you must at least identify some defect reasonably common only

12   to the Ford Bronco II and common to all Ford Bronco IIs at

13   issue.

14        And then it talks about the Walsh versus Ford Motor

15   Company case, which was a suit against an auto manufacturer

16   seeking monetary compensation for the cost of repairing

17   allegedly defective automatic transmissions.  Class

18   certification was not proper where factual disputes over the

19   four engine systems consisting of component configurations

20   employed in at least 17 different models of automobiles over

21   five years threatened to overwhelm the court even before

22   application of different state laws of implied warranty.

23        It leads to the question, at least when I read it,

24   although Harley-Davidson is obviously the leader in air-cooled

25   V-Twin Cam engines, they're not the only manufacturer that

1    uses an air-cooled system.  There are others, both sides agree

2    with that.  And so this question sort of raises the issue of

3    why aren't you condemning those motorcycles as well?

4            MR. KERSHAW:  Well, the answer to that question, Your

5    Honor, is because the heat issues that we're experiencing with

6    respect to these big twins, the class motorcycles, is

7    substantially excessive, and I haven't gone in and

8    investigated other motorcycles, you know, in terms of this

9    issue.  I've had clients come to me with this.

10           But I will observe with respect to the Bronco II case,

11   Your Honor, is that, if I'm not mistaken, in that case those

12   different configurations involved different parts.  We have

13   the same part here.  It's exactly the same part number for all

14   of these Touring bikes in terms of the piston and the head.

15   And the testing methodologies were an issue, there was a

16   dispute with Bronco II.  Whereas here, Your Honor, as to how

17   to go about testing this for heat, there isn't any dispute

18   between the parties on that issue.  It's clear, both parties

19   agree that there is -- that there is the capacity to test

20   whether or not the issues that are subject to general proof

21   will apply to each class member.

22           And so I would submit to the Court that this is a

23   different situation than the Bronco II litigation.  You have

24   exactly the same parts in issue, and the methodologies are the

25   same as between the parties in terms of handling this issue.

1          THE COURT:  You agree with that, Mr. Thomas?

2          MR. THOMAS:  Not at all.

3          First of all, there were in fact common parts, some

4    common parts among the Bronco IIs.  The common parts here

5    apparently that Mr. Kershaw is talking about are cylinders,

6    pistons and rings.  There are far more components than that to

7    the engine and far more components than that to the cooling

8    system in the motorcycles.

9          And Bronco II in this regard is not alone.  In re

10   ignition -- in re Ford Motor Ignition Switch, which is cited

11   in our briefs as well, involves the identical ignition.  And

12   yet, because of surrounding components and the way it was

13   implemented in each vehicle, the court in that case denied

14   class certification because, in fact -- notwithstanding the

15   identity of the component, the court denied class

16   certification.

17         More recently in California, because Ignition Switch,

18   like Bronco II, was not brought under the CLRA or the UCL,

19   I'll cite another case that we cited in our brief.

20         The Hitachi Television Optical Block cases involve a

21   situation where, interestingly enough, the claim was all of

22   the televisions were defective because the air-cooling system

23   used in all of those televisions was defective and failed to

24   properly cool all of them.  And the plaintiffs' expert claimed

25   that there were minor differences and that they all included

1   an LCD -- the same LCD panel.  The court nevertheless denied

2   class certification because there were differences in -- there

3   were numerous and significant distinctions in specific parts

4   of the product.  There were larger lamps, there were

5   different -- different materials used in various components

6   that affected the amount of heat generated in the televisions

7   and denied class certification.

8        We have exactly the same situation here.

9   Notwithstanding the similarity of some parts, the evidence is

10  undisputed --

11       THE COURT:  Let me just stop you there.

12       You wouldn't disagree with the statement that -- let's

13  see -- all Harley-Davidson Touring, Softail and Dyna

14  motorcycles contain identical cylinders, pistons and rings.

15       MR. THOMAS:  I don't know off the top of my head.

16  I'll accept, for purposes of argument, that Darnell has a

17  basis for that.  But, as I said, I can tell you that there are

18  far more components to the engine than cylinders, pistons and

19  rings.  And we know, for example, that there are two sizes in

20  the class alleged in the complaint and four different sizes

21  that plaintiffs are now seeking to certify.  So I can

22  guarantee you that there are differences in the parts that

23  account for the differences in the size, not to mention the

24  differences in the motorcycles as a whole and the cooling

25  systems in the motorcycles as a whole.

1          THE COURT:  Well, Mr. Kershaw also argues that your

2     client agrees there's no question, there's no dispute that

3     there actually is a reliable test that could be used by both

4     sides to answer the question of whether these engines produce

5     excessive heat.

6          MR. THOMAS:  Sure.  We --

7          THE COURT:  You agree with that?

8          MR. THOMAS:  Yes.  There is a reliable test that you

9     can use to measure, for example, the heat that meets -- the

10    heat that reaches the rider in, for example, a 2007 Touring

11    Ultra Guide FLHTCU, which is the bike that Mr. Darnell tested.

12         Now, I don't know why Mr. Darnell got the results that

13    he did.

14         THE COURT:  Right.

15         MR. THOMAS:  But if Mr. Darnell were of the opinion

16    that his testing methodology that he used on that bike is

17    reliable enough to extrapolate and answer the question as to

18    the entire class, then we would have something to argue about.

19         In fact, Mr. Darnell did that test, and instead of

20    saying that the results can be used to answer the question as

21    to the entire class, plaintiffs have withdrawn Mr. Darnell's

22    testimony that the entire class contains defective design.

23    And Darnell admits in paragraph 26 of his supplemental

24    declaration that all this testing would do would reveal how

25    the heat experienced by the rider varies across the

1    configurations.

2         To the extent they have -- since they're not claiming

3    that air cooling is defective per se, they're claiming that

4    air cooling is detective only when it results in excessive

5    heat, but they haven't established how to determine whether

6    any of these 130-plus different components actually generate

7    excessive heat without doing the test on each one of the

8    130-plus different configurations.

9         And by the way, it's 130 plus.  Because if you add in

10   the 1998 and later motorcycles that were purchased after

11   October 2006, you multiply that exponentially.

12        THE COURT:  It sounds to me like you just said there

13   is a test.

14        MR. THOMAS:  Oh, yeah, sure.  Just like --

15        THE COURT:  You just have to apply it across all

16   130 --

17        MR. THOMAS:  Plus.

18        THE COURT:  -- plus configurations.

19        MR. THOMAS:  Yes, just like there's a test to measure

20   weight.

21        If I asked the question is everybody in this room --

22   is anybody -- well, if I asked the question is everybody in

23   the United States overweight, we can answer that question by

24   measuring -- using the reliable scales that we have to measure

25   everybody in the United States.  Does that make it a common

1    question?  No.

2            The question under Wal-Mart versus Dukes, and this is

3    absolutely clear, the question is whether or not the test

4    yields an answer that is common to the entire class.  And our

5    evidence and Darnell's declaration establishes quite the

6    contrary, that the result yields different results for

7    different vehicles.  As this court noted, even Mr. Darnell got

8    different results on the 2007 vehicle that he tested versus

9    the ones that we tested.  And, you know, there may be an

10   explanation for that, but we'd have to look at the motorcycle

11   that Darnell tested.

12           THE COURT:  So there's a test that's reliable, but

13   there's not a test that's reliable enough to allow an

14   extrapolation.

15           MR. THOMAS:  Exactly.

16           THE COURT:  Okay.  I understand your point.

17           I want to focus on Mr. Weyuker for a second, Mr.

18   Kershaw.

19           In the Sanchez case, which is scattered throughout the

20   defendants' brief, as I'm sure you anticipated or expected,

21   one of the problems I had in that case where I didn't certify

22   the class was my concern that the named plaintiff wouldn't

23   adequately represent all the plaintiffs or putative plaintiffs

24   in the class action.

25           My concern was that, as the class rep in that case,

1    she was seeking a remedy that was in effect an economic

2    remedy.  And so if someone had been seriously injured by that

3    stroller, she wouldn't represent them because they weren't

4    going to pursue personal injury damages.

5         And I saw the same thing in this case, that you're

6    pursuing, at least your client is pursuing primarily just

7    economic damages.  Which is interesting because apparently his

8    leg was burned six or seven times, and his pants caught on

9    fire, but he's not seeking personal injury damages.

10        Why shouldn't that concern me?  Why shouldn't that

11   result in a finding that he isn't in effect an adequate

12   representative for the putative class?  I mean, what do you do

13   with a person that maybe suffered serious, serious burns from

14   this motorcycle and wants monetary damages for that?  Are you

15   going to tell them to go away?

16        MR. KERSHAW:  Well, Your Honor, if I had advised my

17   client to seek a personal injury damage class, of course, as

18   I'm sure the Court knows, that that simply wouldn't fly.

19   Individualized issues would predominant.  And any resolution

20   of this matter on a class-wide basis would not include

21   personal injury damages on something like this.

22        If -- and there are cases out there where -- well,

23   there are cases out there where people have had heat problems,

24   they've gone under big rigs, and those are individual damages

25   cases that are brought as personal injury cases.  And so those

1  would not be affected and a person's ability to go forward

2  with those would not be affected by this case.

3       THE COURT:  Let me get the specific quote from

4  Sanchez.  I had it, but I can't find it.  I don't know if I

5  have Sanchez here or not.

6       MR. KERSHAW:  Your Honor, is the import of the Court's

7  comments that this is a lawyer driven lawsuit because --

8  that's what the Court thinks about this --

9       THE COURT:  Yeah.

10      MR. KERSHAW:  -- seriously?

11      Are you asking me to respond to that, Your Honor?

12      THE COURT:  At least in that case, it appeared to be

13 more driven by that than a concern for the class members.

14 That was sort of the gist.  And there's a case that suggests

15 that if the Court seems to find that it is lawyer driven --

16 maybe you can help me, Mr. Thomas, as to where in your brief.

17 I want to get to it specifically.  You argued about that.

18      MR. THOMAS:  Sure.  Surprisingly I don't have a copy

19 of Sanchez to hand up either, but we did make this point --

20      THE COURT:  All right.

21      MR. THOMAS:  -- in our brief, at page 13 of our brief.

22 And we quoted this part of your opinion in Sanchez:

23      Despite plaintiffs' professed concerns over the

24 alleged danger presented by the stroller in that case and the

25 fiduciary duty to fairly and adequately represent putative

1   class members, plaintiffs' counsel has chosen not to pursue

2   any personal injury claims on behalf of those class members,

3   but rather to limit their claims to economic injury.

4         This strategic claims splitting decision creates a

5   conflict between plaintiffs' interests and those of the

6   putative class and renders plaintiff an inadequate class

7   representative.

8         THE COURT:  There it is.  You want to respond to that?

9         MR. KERSHAW:  Well, Your Honor, I don't think there's

10  any claim splitting here between personal injury claims and an

11  economic claim on the basis of the CLRA.  They're both

12  standalone claims.

13        And this case had, you know, nothing to do -- in terms

14  of being lawyer driven, you know, another lawyer brought this

15  case to me.  So, you know, I don't -- I just simply don't see

16  the propriety or the fairness of that issue in this case.

17        THE COURT:  Well, you do have a professed concern over

18  the alleged danger presented by the motorcycle, correct?

19        MR. KERSHAW:  Yes.

20        THE COURT:  And if there is that alleged concern in

21  that so-called danger and someone is injured because of that

22  defect and because of that danger, you're not representing

23  that person.

24        MR. KERSHAW:  That could not be a class case, Your

25  Honor.

1          THE COURT:  Even if the injury was caused by the same

2     defect?

3          MR. KERSHAW:  Correct.

4          THE COURT:  Why?

5          MR. KERSHAW:  Because the personal injury --

6          THE COURT:  According to you the defect is subject to

7     common proof.  That only goes to damages.

8          MR. KERSHAW:  No, it goes to if a person has an

9     individual personal injury who is seeking compensation for

10     that and alleges a class -- say there's 5,000 people out there

11     who have been injured similarly -- the individual issues in

12     that case would predominate because of the nature of the

13     claims being pursued.

14          THE COURT:  Okay.  And then there's the arguments also

15     sort of arising out of the Sanchez case, and it really goes

16     somewhat to the materiality issue, and that is the issue of

17     whether, you know, behavior really would have been changed,

18     you know, whether there is a reasonable consumer standard that

19     can apply to the facts in this case.  And defendants talk

20     about this on page 17 talking about Webb versus Carter's and

21     also then the Sanchez case, arguing as follows:

22          In Sanchez, the plaintiff claimed that the stroller

23     had a dangerous pinch point, and that she would not have

24     purchased it had she known of this danger.  The court denied

25     certification in part because, quote, class members are likely

1   to react differently to the disclosure of safety information.

2   Therefore, there are no common issues and certainly no common

3   issues that predominate.

4       On rehearing, the court reaffirmed its holding noting

5   that the plaintiff had failed to offer any evidence that the

6   objective, reasonable consumer would have considered the

7   alleged misrepresentations to be material.  Other courts

8   similarly recognize that consumers could have a wide range of

9   reactions to the undisclosed safety information depending on a

10  number of factors, including their personal degree of risk

11  aversion and their assessment of the other advantages and

12  disadvantages of buying the vehicle at issue.

13      The same conclusion is required here.  Like the

14  defendant in Webb, Harley-Davidson has presented evidence from

15  Dr. Christine Wood, a human behavior expert, that establishes

16  that materiality would vary from consumer to consumer such

17  that the reasonable consumer standard cannot be applied.

18  Further, Dr. Woods' declaration establishes that consumers

19  would not be expected to respond uniformly to a truthful

20  disclosure.  This is particularly true because individuals

21  differ with respect to their sensitivity to heat, such that

22  heat that might cause one rider to be uncomfortable will not

23  even be noticed by another rider.  Here, as in Webb and

24  Sanchez, plaintiffs have presented no evidence to the

25  contrary.

1          Your reply actually in your reply brief was

2     interesting.  You attempted to distinguish Sanchez and Webb in

3     your footnote 10, but I found this interesting.  You say this

4     proposed class action does present the confounding

5     circumstance that Harley-Davidson has such a devoted following

6     that it can successfully market and sell a defective product.

7          And I know you're not admitting to what the defendants

8     are arguing, but I don't know if implicit in there is an

9     admission that because of the uniqueness of these motorcycles,

10    that defendants' point is valid, that there is no reasonable

11    consumer here, that everybody who is going to buy a Harley or

12    has bought a Harley-Davidson motorcycle might react

13    differently to those warnings even if they had been there.

14         But I think the point that the defendants are trying

15    to make is there's really no counter to Dr. Woods' argument

16    and/or what the court found in Webb and/or Sanchez.  So I want

17    to give you a chance to respond to that.

18         MR. KERSHAW:  Well, Your Honor, the confounding aspect

19    of it was that, first of all, I think Harley-Davidson does

20    promote a fix that results in the vehicle becoming illegal.

21    The reasonable consumer standard, if there is a -- let's

22    presume, for the sake of discussion, that there is excessive

23    heat coming off the motorcycle, and that is a safety defect

24    because of all the reasons we've already seen, somebody

25    becoming distracted by that and -- while driving in traffic.

1          We believe that that, under the case law, is material.

2    And if you have a material defect, particularly a safety

3    defect, that under the law disclosure is per se required with

4    respect to that defect.  And, you know, I think, you know,

5    whether or not this is excessive is one of the merits

6    determinations to ultimately be made in the case, but here

7    today that's not the issue.

8          THE COURT:  Let me reread this and have you respond to

9    it.

10          There are enumerable variations in the experiences and

11    information possessed by consumers, in the factors that

12    influence consumers' purchasing decisions and in the manner by

13    which consumers react to product warnings and the disclosure

14    of safety information.  The putative class will include

15    persons who knew about the alleged hazard, yet purchased the

16    product anyway; people like plaintiff who bought the product

17    because of its price, size and other characteristics; and many

18    others for whom the warning would have made no difference in

19    their purchase decision.

20          You disagree with that?

21          MR. KERSHAW:  Your Honor, I think what the Court is

22    saying is that there's endless variations in how somebody

23    might react to a warning.  And if this was controlling truly

24    in a class case, there would never be a class action ever on

25    these issues, under the CLRA on this kind of an issue.  There

1   would be no reason to have the statute.  So I think it goes to

2   the other extreme, Your Honor.

3        THE COURT:  Okay.  And then in terms of common

4   questions as to damages, the defendants have argued -- the

5   plaintiffs have submitted or plaintiff has submitted that you

6   can establish the amount of overpayments made for the

7   defective product by determining the cost of a retrofitted

8   liquid-cooling system which would cure the defect and deliver

9   to class members the benefit of their bargain.

10        The defendants have argued that calculating damages is

11   not a common issue because class members who have ridden their

12   class motorcycles -- and they were talking about Vandermolen,

13   for example, who had ridden his motorcycle 150,000 miles --

14   cannot plausibly claim that they overpaid for their

15   motorcycles.  Defendants also argue that Mr. Darnell's

16   testimony and the testing by Mr. Darnell and the testing by

17   defendants' experts confirm that a retrofitted liquid-cooling

18   system would not necessarily result in any reduction in heat.

19        Plaintiffs have responded that, as a general rule, if

20   the defendants' liability can be determined by facts common to

21   all members of the class, a class will be certified even if

22   the members must individually prove their damages.

23   Essentially you're citing to Brinker, which is a California

24   Supreme Court case, not a federal case, and Yamada, which you

25   quote says:  Though the amount of damages is invariably an

1    individual question, it does not defeat class action

2    treatment.

3          It's still not clear to me how you would calculate

4    damages.  Where's the common question, common issue with

5    respect to damages?

6          MR. KERSHAW:  Well, Your Honor, we are at the

7    beginning of the case.  And in terms of, you know, is there a

8    fix to this group of motorcycles that's out there, these

9    44,000 of the many hundreds and hundreds of thousands or

10   millions that exist out there -- for instance, an oil cooling

11   fix, that would be easier than a retrofitted water -- I don't

12   know.  You know, I'm not an expert in that.  I'm not -- I

13   don't have an answer as to, you know, what is exactly the

14   universal fix.

15         I do know that I've talked to people who say a fix

16   could be fairly straightforward.  Harley-Davidson has

17   already -- they've taken out a patent on a water-cooled

18   engine.  They have a water-cooled motorcycle.  You know,

19   whether there's a retrofit for this, whether it would be

20   the -- you know, a resolution would include a payment of

21   damages to individuals who experienced this in the class.  How

22   exactly that would play out at this point in time is difficult

23   to say.

24         But I do think that the fact -- you're absolutely

25   correct.  Blackie v. Barrack, I mean, is black letter law that

 1   damages and individual variations in damages don't prevent

 2   class certification.

 3        THE COURT:  Why do you argue, though, in your opening

 4   brief, page 2, that the economic harm suffered by class

 5   members can be demonstrated as to the entire class?

 6        MR. KERSHAW:  Because they paid for something, a

 7   reasonably usable product that they did not receive, one that

 8   under normal operating conditions causes discomfort while

 9   riding.  And they have to take measures, and some of them in

10   different ways -- some spent $100, some spent $500, some spent

11   $1,500 for different fixes for this.  And those are economic

12   damages that each class member experienced.  Certainly the

13   representative plaintiffs experienced that.  They tried to fix

14   the defect that they were experiencing, one with a Dyno-Tune

15   Power Commander, the other with different pipes and ultimately

16   has put a Super Tuner on the bike to get away from the heat

17   issue.

18        So every single, you know, class member who is -- who

19   is not enduring -- and, like I said, some class members come

20   up with all sorts of contraptions.  I've had one client come

21   to me and say can I patent this?  And so they are suffering

22   economic damage, Your Honor.

23        THE COURT:  In Sanchez, I wrote:  Whether any

24   particular stroller was, quote, devalued by the alleged

25   breach, it is likewise an inherently individualized issue.

 1    For example, in plaintiff's case, she made full use of the

 2    perfectly functioning stroller for 18 months.  Plaintiff must

 3    prove that she did not receive her $20 worth from the

 4    stroller.  It's impossible for her to prove that each and

 5    every one of the hundreds of thousands of potential class

 6    members did not receive the stroller's worth either.

 7             Isn't that true here?

 8             MR. KERSHAW:  No.

 9             THE COURT:  Why not?

10             MR. KERSHAW:  Because the individual that you referred

11    to, they had to engage -- take measures and pay for it to make

12    the bike sufficiently comfortable to ride without the heat.

13    And then, once that occurred, then they rode it for long

14    distances.  But they had to engage in the economic loss before

15    they did that.

16             THE COURT:  You can say that across the board.  There

17    wouldn't have to be any evidence, discussion, issue concerning

18    what each individual did with the bike once they bought it.  I

19    mean, it sounds to me like you're saying every member of the

20    class did exactly the same thing.

21             MR. KERSHAW:  I don't know --

22             THE COURT:  We know that's not true, because the other

23    members of the class that you had initially, one of the guys

24    rode his bike for over a hundred thousand miles.  He's no

25    longer in the class.

1           MR. KERSHAW:  But after it was modified, Your Honor,

2    after it was modified to deal with the heat issue.

3           THE COURT:  Okay.  And then finally I want to focus on

4    typicality, which requires that the claims or defenses of the

5    class representative be typical of the claims or defenses of

6    the class.  The class rep must be part of the class and

7    possess the same interests and suffer the same injury as the

8    class members.  Typicality is satisfied only when each class

9    member's claim arise from the same course of events and each

10   class member makes similar legal arguments to prove the

11   defendants' liability.

12          Right now your only plaintiff is Mr. Weyuker.  And

13   there is evidence, at least in this record, that his

14   motorcycle, the one he purchased had been modified already.

15   There are some slight differences in his motorcycle.  And it's

16   not discussed a lot in the briefs, but it is pointed out that

17   maybe he's not typical.

18          And here's the defendants' argument.  He's not typical

19   because plaintiffs have not shown that he's been injured by

20   the same course of conduct as other class members.  Plaintiffs

21   have made no attempt to show that his 2009 Softail Cross Bones

22   with the air-cooled 96 cubic inch V-Twin Cam engine is

23   substantially similar in any relevant respect to other model

24   year motorcycles, to any Softail model with a TC-88 engine or

25   indeed to any of the 130 distinct configurations.  Plaintiffs

1    have not presented any evidence that the radiant heat

2    experienced by riders of the 2009 Cross Bones is comparable to

3    the heat experienced by riders of any other model.  And

4    plaintiffs have not shown that Weyuker's claim is typical even

5    of claims made by other owners of the 2009 Softail Cross

6    Bones.

7                By the way, what does FLSTSB mean?

8                MR. THOMAS:  I don't know.

9                THE COURT:  Nobody seems to know.

10               MR. THOMAS:  It's -- I don't know.  Of course,

11   Harley-Davidson attaches these letters to all of its models,

12   and I don't know.

13               THE COURT:  Okay.  Weyuker's particular complaints are

14   likely attributable to the fact that the exhaust shields on

15   this vehicle had been removed, compromising the heat

16   management system and exposing him to a risk of direct contact

17   between skin or clothing and hot exhaust components.  And,

18   therefore, defendants argue that he's not typical, he's not

19   the typical class plaintiff and I shouldn't find that

20   typicality has been satisfied.

21               MR. KERSHAW:  Your Honor, he bought the motorcycle

22   from Harley-Davidson's stock, that is how it came to him, and

23   it was represented to him as a stock motorcycle.  He has

24   always believed that it was stock.  And he specifically

25   resisted doing anything that would take it out of warranty for

1   a very long period of time.  And so, you know, if

2   Harley-Davidson sold it to him not stock, that's something

3   that I need to investigate.

4           But the other issue is, in terms of his motorcycle not

5   being typical, there's no question that the core functioning

6   component of the Twin Cam is the same part for every one of

7   these motorcycles.  And it's certainly typical because it

8   is -- it has the same part number, and that configuration is

9   air-cooled.

10          And I would submit that Mr. Weyuker certainly can

11  serve and is typical because typicality goes to essentially

12  the similarity of his claim.  And his claim is certainly the

13  same with respect to excessive heat that every other class

14  member here has.

15          THE COURT:  Okay.  Mr. Thomas, there's language

16  throughout a number of cases, Wolin in particular which the

17  plaintiffs rely on, in which the court wrote that proof of the

18  manifestation of a defect is not a prerequisite to class

19  certification.

20          So why shouldn't this class be certified even if

21  you're arguing that there's been no proof of a manifestation

22  of a defect?

23          MR. THOMAS:  Well, we don't argue in our brief that

24  manifestation is required or precludes class certification

25  except to the extent that plaintiffs seek certification of a

1    class under the unlawful prong of the UCL based on their

2    claims for breach of implied -- based on the tort claims of

3    strict liability and breach of implied warranty.  And the

4    argument there is that the elements of the claim -- there is

5    no unlawful -- there is no tort and there is no breach of

6    warranty unless the defect actually manifests itself and

7    there's causation.  And so the elements of those claims

8    require manifestation.

9            So as to those claims, it's true, as the Ninth Circuit

10   said, that manifestation is not per se a requirement for class

11   certification.  But if manifestation is an element of the

12   underlying tort, you have to look at whether that element of

13   the underlying tort is susceptible to common proof, which is

14   why, by the way, Mr. Kershaw is correct, that personal injury

15   cases cannot generally be certified because personal injury

16   cases require proof that an injury was -- an injury actually

17   occurred and that it was caused by the defect, which generally

18   preclude certification of classes for personal injury claims.

19           And that same analysis applies to their tort -- their

20   UCL unlawful claims based on tort law and breach of implied

21   warranty.

22           With regard to the other claims, all of the other

23   things that we've been talking about today which really don't

24   relate to manifestation are why those claims should be not

25   certified.

1          THE COURT:  Tell me why Wolin and -- what's that other

2    case?

3          MR. THOMAS:  Chamberlain?

4          THE COURT:  Chamberlain, why those two cases aren't

5    controlling as opposed to the cases that you've cited?

6          MR. THOMAS:  In Chamberlain -- well, there is a

7    fundamental difference -- there's lots of reasons which are --

8    and basically none of the arguments that we make in our brief

9    apply to the defects that were alleged in Chamberlain and

10   Wolin.

11         By the way, there were two claims at issue in Wolin,

12   one of which the court said probably can't be certified

13   because you couldn't prove causation.

14         THE COURT:  Right.

15         MR. THOMAS:  But the main difference between this case

16   and Wolin is that there is no conceivable way that the defect

17   in this case could have been concealed.  If plaintiffs are

18   correct, every single owner of every single Harley-Davidson

19   motorcycle with a TC-88 or a TC-96 engine sold since 1998 has

20   been experiencing this allegedly defective heat, and yet

21   thousands of people continue to buy these motorcycles,

22   including Mr. Johnson.

23         In Chamberlain, it was -- which was my case by the

24   way.  In Chamberlain, it was a defective exhaust manifold that

25   people would have no reason to even know was -- that people

1  would have no reason to know that their vehicle even had an

2  exhaust manifold until the thing failed and they had to pay

3  for it.

4          And in Wolin, it was either tires or --

5          THE COURT:  It was tires.

6          MR. THOMAS:  Tires.  I was going to say tires or

7  brakes, but it was tires.  And so people wouldn't know that

8  until a long time after they had purchased their vehicles.

9          Where here we're dealing with a Harley community where

10  the evidence in this case amply shows that Harley owners ride

11  together, they belong to Harley owners clubs, they talk to

12  each other about their vehicles.  There is simply no way that

13  this could have been concealed.

14          In fact, Johnson -- it really goes back to the point

15  that Harleys are in fact unique.  Johnson, for example, drove

16  his first 2007 Ultra Glide for 9,000 miles, presumably --

17  well, not presumably -- did experience whatever defect,

18  whatever excessive heat he's claiming was there.  What did he

19  do when that motorcycle was totaled?

20          THE COURT:  He bought another one.

21          MR. THOMAS:  He bought another one.

22          You know, and so all of the reasons -- you know, the

23  fact that we're dealing with -- in Chamberlain there was

24  evidence, in Chamberlain and Wolin both, there was evidence

25  that the class representative had a vehicle that was

1    substantially similar in relevant respects to other vehicles

2    in the class.  There's no such evidence in this case.

3          THE COURT:  Do we know why he got -- even though he

4    apparently bought it stock from Harley, why his motorcycle was

5    different?  Has anybody figured that out?

6          MR. THOMAS:  No, we don't know the answer to that.

7    But, by the way, Mr. Kershaw keeps equating Harley-Davidson

8    with Harley-Davidson dealers.  The motorcycle was sold by a

9    Harley-Davidson dealer to Mr. Weyuker, not by Harley.

10          THE COURT:  Right.

11          MR. THOMAS:  And by the way, even if it was sold

12   directly by Harley, Mr. Weyuker is not purporting to represent

13   a class of people who bought motorcycles with the exhaust

14   shields removed.  If he were, I'd have a different argument

15   here today, but that's not his claim.  And so that, of course,

16   is another feature that distinguishes this case from

17   Chamberlain and Wolin.  I mean, literally if you look at the

18   cases, there's almost no resemblance between the two.

19          THE COURT:  Mr. Kershaw, why doesn't American Honda

20   Motor, Hitachi and Sanchez control the class cert issue in

21   this case?  Why don't those three cases -- well, why aren't

22   they applicable to the facts before the Court in this case?

23          MR. KERSHAW:  Your Honor, when you say American Honda

24   Motor, is that the oscillation defect or is that the third

25   gear defect?

1          THE COURT:  It's American Honda Motor versus Superior

2     Court.  It's the car owners who purchased or leased 2002 to

3     2008 models of a car who had not had a redesigned third gear

4     set installed.

5          MR. KERSHAW:  Okay.  Well, Your Honor, first of all,

6     in American Honda, that case didn't involve anything like what

7     we have here, which are engineering reports.  There there was

8     simply a TBS or a service bulletin that plaintiffs were

9     relying on.  And in this instance, the engineering reports

10    specifically establish the type of methodology that can be

11    used for testing.

12         Additionally, in American Honda, the --

13         THE COURT:  The court writes, which is sort of

14    interesting, the plaintiff had at least eight months to

15    conduct discovery to support his class certification motion

16    and does not contend that he was thwarted in his efforts.  He

17    makes no valid showing that he will be able to identify some

18    vast pool of class members who suffered the defect in silence.

19         Are you saying that you are going to be able to find a

20    vast pool of class members who have suffered this defect in

21    silence?

22         MR. KERSHAW:  What I'm saying is, again, Your Honor,

23    there's a vast pool of class members out there whose bikes are

24    modified so that they don't have to endure the excessive heat

25    that's produced by this design.  And I think that's a real

1    public policy consideration for this court.

2              THE COURT:  Well --

3              MR. KERSHAW:  The --

4              THE COURT:  -- why should that be a -- I don't know.

5    That sends chills down my back when a lawyer argues that a

6    court should be considering public policy implications.

7              MR. KERSHAW:  Well, I say that --

8              THE COURT:  The reason I say that is it comes back to

9    this discussion we had briefly about the EPA and the National

10   Highway Transportation Safety Board.  They're much better

11   equipped and much better designed to deal with these types of

12   issues than a court, and in fact that's their specific

13   responsibilities and task.  Why should any court get involved

14   in public policy issues?

15             MR. KERSHAW:  Your Honor, with respect to the National

16   Highway Traffic Safety Board, Parkinson versus Hyundai, at I

17   believe 298 F.R.D. 580, discusses this issue about, you know,

18   when there's complaints to -- in this instance it was the

19   Better Business Bureau which offered a procedure to resolve

20   claims dispute.  And the court there found that that kind of

21   procedure would not be superior to the class mechanism when

22   what we're dealing with here is violations of the CLRA and the

23   UCL, which provide remedies that NHTSA does not provide, and

24   provides a whole statutory scheme that, if we were to say that

25   just because NHTSA is out there that they're going handle

1    these kind of claims, there would never be a class mechanism

2    that would address vehicle safety problems.  And we know

3    that's not the case.

4              THE COURT:  Okay.  I interrupted you.  Sorry.  You

5    were going to talk about American Honda.  You were going to

6    talk about Hitachi and Sanchez.

7              You do distinguish Sanchez and Webb in your brief --

8              MR. KERSHAW:  Your Honor --

9              THE COURT:  -- but you haven't had a chance to discuss

10   Hitachi.

11             MR. KERSHAW:  Your Honor, I would -- with respect to

12   Hitachi, I am not sufficiently familiar with that to comment

13   to the Court.

14             With respect to -- I can continue to distinguish

15   American Honda, but I think that -- well, with respect to

16   American Honda, the modifications in American Honda play

17   entirely different roles.

18             In American Honda, the consumer modifications

19   undermine causation and plaintiffs' warranty claim.  And in

20   our case here, we're not asserting a breach of warranty on a

21   class-wide basis.  And the modifications at issue are, you

22   know, that these recommended -- that is these type of

23   modifications that get rid of the heat were recommended by the

24   defendant.  They're necessary for managing excessive heat

25   relating to a defective design, that's our position.  They

1    make the vehicles illegal to operate.  And they help explain

2    why heat issues here aren't being reported, a very different

3    situation than existed in American Honda.

4         And unlike in American Honda, we have provided expert

5    testimony on the methodology with respect to the defect of the

6    design and how to go about establishing that on a common

7    basis.  And this case involves omissions, not affirmative

8    misrepresentations.

9         THE COURT:  All right.

10        MR. KERSHAW:  So, anyway, enough said.

11        THE COURT:  A final question to both of you.  The

12   issue, I think the most significant issue in this case is the

13   (a) factors, the 23(a) factors, especially (a)(2), questions

14   of law or a fact common to the class are significant.  But

15   it's the (b)(3) issue that concerns me in this case, that the

16   common questions have to predominate over the questions

17   affecting only individual members.  And then the second part

18   of that is whether resolution is superior, class resolution is

19   superior to other available methods.  But it's really the do

20   common questions predominate.

21        Mr. Kershaw, just focusing on the (b)(3) issue, tell

22   me why you think -- assuming there are common questions, why

23   they predominate over any questions affecting only individual

24   members.

25        MR. KERSHAW:  Because the common question, really the

1    common question in this case -- if I could get it exactly

2    right here -- is whether or not Harley-Davidson's V-Twin Cam

3    design runs excessively hot under reasonably foreseeable

4    operating conditions such that it poses a safety risk to

5    consumers and others on the highway such that it needs to be

6    disclosed.  I think that is the heart of the common question.

7         And in order to make that determination -- and, you

8    know, we have talked a lot about this, and I'm repeating

9    myself, Your Honor, and for that I apologize.  But the

10   methodologies are pretty clear to address the issue of how

11   much heat does it take to burn skin and to test how much heat

12   is coming off of this vehicle, and that's through

13   thermocouples.  Again, the parties don't disagree about the

14   methodology to do that and, therefore, this issue predominates

15   the litigation.

16        You know, I keep coming back to it.  You've got the

17   same part with respect to each of these vehicles, and that

18   predominates the litigation.

19        And with respect to the subject matter of expert

20   testimony, it's an area of science that is well-studied and

21   well-established in the scientific community as to the

22   temperatures at which pain, the threshold of pain exists, 111

23   degrees, and when first, second and third degree burns occur.

24   And, again, that's another common issue that predominates the

25   litigation.

1          And the issue of the knowledge that Harley-Davidson

2    had is reflected -- which is also a common predominating issue

3    and an issue in this case, is reflected in the testing that it

4    did, that it has done, and that is the same, will be the same

5    for every class member.  And whether or not that knowledge is

6    superior is also an issue that predominates the litigation.

7          Whether or not this is a safety defect and gives rise

8    to a duty to disclose under the law is a legal issue that

9    predominates the litigation.  And whether Harley-Davidson

10   disclosed it, you know, that is going to be the same evidence

11   for each and every class member.

12         And, finally, whether the nature of this defect that

13   we believe involves safety concerns is material, that also

14   predominates the litigation.

15         THE COURT:  All right.  Mr. Thomas, same question to

16   you, but obviously you're going to take the opposite view.

17         MR. THOMAS:  Yeah.  Plaintiffs have not actually

18   identified a single question that is truly common, a

19   significant question that is truly common to this.  Whether or

20   not there is a design defect is not common because, as we've

21   discussed at length, the amount of -- the testing that

22   Harley-Davidson did shows that the amount of heat generated by

23   these motorcycles is not common, it differs from motorcycle to

24   motorcycle, from configuration to configuration.

25         For purposes of the CLRA and the UCL fraudulent

1    prongs, the issue of defendants' duty is not a common question

2    for two reasons.

3         First of all, as we've discussed already at length,

4    materiality is not a common issue.  I mean, Johnson's

5    testimony by itself demonstrates that different people --

6         THE COURT:  Slow down.

7         MR. THOMAS:  I'm sorry.

8         Johnson's testimony alone demonstrates that some

9    people are going to purchase these vehicles even with full

10   knowledge of what excessive heat they're -- what heat they're

11   generating, whether it's excessive or not.

12        The other reason, we haven't discussed this today, but

13   it's significant particularly in light of the Gray decision,

14   is the defendants' exclusive knowledge is not a common

15   question.

16        This is not something that can be concealed.

17   Plaintiffs might argue that those individuals who purchased

18   the first model of a model year did not know what Harley

19   knows.  But with respect to Weyuker, for example, who

20   purchased his vehicle two years after the 2009 FLSTSB was

21   introduced, cannot reasonably claim that Harley had exclusive

22   knowledge at that time of something that everybody who

23   purchased those motorcycles had to have been experiencing as

24   soon as they drove the vehicle over 20 miles an hour.

25        The issue of causation is not common with respect to

1    the CLRA, which requires proof of reliance, for largely the

2    same reasons that materiality is not a common question.

3    Reliance is not a common question.

4         With respect to the UCL claims based on the unlawful

5    prong, based on violations of tort law or breach of warranty,

6    as we've discussed, manifestation and causation are not common

7    questions.  Although I think I heard Mr. Kershaw say that he's

8    no longer claiming the class-wide breach of warranty -- he's

9    no longer claiming that a breach of warranty claim can be

10   certified on a class-wide basis, which may dispose of that

11   claim.

12        Damages are not a common question because there are

13   people who own -- people like Vandermolen who have driven

14   motorcycles for 150,000 miles.  And the idea that every one of

15   those people modified their vehicles to allow them to do that

16   is simply sheer speculation.  Damages are not a common

17   question for that reason.  A lot of owners of these

18   motorcycles got full use of their motorcycles for a long

19   period of time.

20        And finally, although not a major issue for purposes

21   of the CLRA, whether or not the purchaser bought these

22   motorcycles for personal or for business use is a common

23   question.  Some of these vehicles are -- some of these

24   motorcycles -- excuse me.  I'm used to dealing with car cases,

25   so I tend to use the word "vehicle" when I mean motorcycles.

1    We know that some of these motorcycles were purchased

2  for police use, and so by itself it may not justify denying

3  class certification.  But just like damages by itself, the

4  individual nature of the damages inquiry by itself may not

5  justify denying class certification.  But here, when you

6  combine them with all of the other individual issues, there is

7  no -- it's very difficult to find a single common issue.  But

8  if there is a common issue lingering there, lurking there

9  somewhere, it's overwhelmed by these individual issues.

10    THE COURT:  Okay.  All right.  We'll take a break, and

11  then I'll come out and decide the motion.

12    (Recess taken.)

13    THE COURT:  I apologize for taking so long, but what

14  I've come to the conclusion of is that I'm not going to rush

15  the decision and try to issue findings and reach legal

16  conclusions this afternoon.  Based on the oral arguments,

17  there are a number of questions that have been raised that I

18  think need further consideration by the Court.  And I don't

19  think it's fair, especially in a case where both parties have

20  worked so hard, to come out and do it off the cuff.

21    So I will take it under submission.  I apologize for

22  making you wait.  And I will do my best to get a written

23  decision out to you as soon as possible.

24    I always hesitate, and I wish I could give you a

25  decision today so you know which manner to move forward.  And

1    when I take matters under submission then you're now subject

2    to competing with the 1,100 other cases that I have, which is

3    why we like to try to decide cases when I have oral argument,

4    at the time of oral argument.  But, again, I think that

5    there's too many issues here, too much material that's been

6    provided to the Court, and too much significance with respect

7    to the decision to simply give you an off-the-cuff decision on

8    the record.  So I will take it under submission.  I'll get an

9    order out to you as soon as I can, and that's the best I can

10   promise you given our caseload.  But we'll do our best.

11              Any questions?

12              MR. KERSHAW:  Thank you, Your Honor.

13              MR. THOMAS:  Thank you, Your Honor.

14              MR. NYSTROM:  Thank you, Your Honor.

15              THE COURT:  Okay.  Thank you all.

16              (Proceedings were concluded at 3:30 p.m.)

17                      ---o0o---

18

19

20

21

22

23

24

25

1          I certify that the foregoing is a correct transcript

2     from the record of proceedings in the above-entitled matter.

3

4
                              /s/ Kathy L. Swinhart
5                             KATHY L. SWINHART, CSR #10150

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25